UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL CARTER,

                Plaintiff,           Civil Action No. 21-10518

v.                                 Robert H. Cleland
                                 United States District Judge

HEIDI WASHINGTON, *et al.*,       David R. Grand
                                 United States Magistrate Judge

                Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT ON THE BASIS OF EXHAUSTION (ECF No. 28)

*Pro se* plaintiff Joel Carter ("Carter"), an incarcerated person, brings this civil rights action against numerous employees of the Michigan Department of Corrections ("MDOC") and Michigan Parole Board ("MPB") (collectively, "Defendants"), alleging that Defendants' unconstitutional policies and practices have a disparate impact on him and fail to accommodate his disability-related needs, and that Defendants also subjected him to cruel and unusual punishment for his symptoms of mental illness. (ECF No. 1; *see also* ECF No. 8). Specifically, he names as defendants Heidi Washington, MDOC Director; Kenneth McKee, MDOC Deputy Director; David Dawdy, MDOC's Mental Health Director; Michael Eagan, chairman of the MPB; and current or former MPB members Abigail Callejas, Charles Brown, Amy Bonito, Barbara Sampson, Brian Shipman, Melissa Jennings, Jerome Warfield, Anthony King, Sonia Warchock, and

Timothy Flanagan.  The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b).  (ECF No. 9).

On March 8, 2022, Defendants filed a motion to dismiss and for summary judgment on the basis of exhaustion, along with a brief in support.  (ECF No. 28).  Carter timely filed a response (ECF No. 31)[1], and Defendants filed a reply (ECF No. 32).

## I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the Defendants' Motion **(ECF No. 28)** be **GRANTED IN PART AND DENIED IN PART.**

## II.  REPORT

### A.  Brief Factual Background

Carter is a MDOC prisoner who is currently confined at the Macomb Correctional Facility in Lenox, Michigan.  On February 23, 2021, he filed this civil rights action, alleging violations of (1) his Eighth and Fourteenth Amendment rights brought under 42 U.S.C. § 1983; (2) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and (3) Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

On July 29, 2021, the Honorable Robert H. Cleland screened the complaint pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), summarizing the allegations in Carter's complaint as follows:

> Plaintiff alleges that he suffers from serious mental disabilities and the neurological condition known as multiple sclerosis.  He contends that Defendants' unconstitutional policies and practices have a disparate

---

[1] Although Carter's pleading (ECF No. 31) is entitled a "Motion for Summary Judgment and Response to Defendants' Motion to Dismiss and for Summary Judgment on the Basis of Exhaustion," the Court construes this filing as a response to Defendants' motion (ECF No. 28).

impact on him and fail to accommodate his disability-related needs. More specifically, he contends that Defendants issue sham misconduct reports about him as a pretext for discriminating against him because of his disabilities. As a result of the misconduct reports, he allegedly has been placed in segregation, indefinitely confined in maximum facilities, barred from visiting with family, subjected to unjustified incarceration, and denied programs, services, and activities in violation of the ADA.

Plaintiff also asserts that Defendants Washington and Dawdy have a practice of punishing mentally disabled prisoners for symptoms related to their mental illness and that they have failed to train their employees on how to handle mentally disabled prisoners. According to Plaintiff, MDOC officials have issued over 330 misconduct reports even though the behavior that prompted the misconduct reports was a symptom of mental illness. The sanctions for the alleged misconduct have included six years in segregation and ten years in a maximum-security facility. Plaintiff further alleges that the conditions in maximum correctional facilities exacerbate his physical and mental disabilities and that Defendants refuse to provide special accommodations or meaningful access to MDOC mental health programs.

In addition, members of the Michigan Parole Board have denied Plaintiff release on parole seven times: in 2012, 2014, 2015, 2017, 2018, and twice in 2020. The allegedly sham misconduct reports were, according to Plaintiff, used as a pretext for doing so. State officials have also denied Plaintiff a "D-42," which is a referral for a psychological evaluation before a prisoner is considered for parole, and a "D-47," which is a mental health program that allows mentally disabled prisoners to be released for community-based treatment. Additionally, Parole Board members allegedly rely on inaccurate information when evaluating Plaintiff for parole, they issue continuances as disciplinary treatment for mental illness, they fail to consult with mental health staff for information about mitigating factors, and they are more likely to deny parole to mentally ill prisoners than to prisoners without mental illness.

Plaintiff's legal claims are twofold. First, Plaintiff asserts that Defendants refused to (a) provide him with reasonable accommodations or to modify the administration of mental health services and (b) excluded him from programs and services due to his disabilities [which] constitute violations of Title II of the ADA, § 504 of the RA, and the Fourteenth Amendment to the United States Constitution. Second, Plaintiff claims that Defendants subjected him to cruel and unusual

3

punishment when they punished him for symptoms of mental illness and subjected him to extreme deprivations in violation of § 1983 and the Eighth Amendment to the United States Constitution. Plaintiff seeks monetary, declaratory, and injunctive relief, including expungement of all misconduct findings and an order directing Defendants to provide him with the services and benefits to which he is entitled.

(ECF No. 8, PageID.132-34) (citations omitted).

Upon screening, the Court summarily dismissed Carter's § 1983 claims for money damages against Defendants in their official capacities based on Eleventh Amendment immunity, as well as his ADA and RA claims against Defendants in their individual capacities because neither the ADA nor RA allows for suits against government officials in their individual capacities. (*Id.*, PageID.139). Thus, Carter was permitted to only proceed on his § 1983 claims against Washington, McKee, and Dawdy in their individual capacities for money damages, and on his § 1983, ADA, and RA claims against all Defendants in their official capacities for prospective relief.[2] (*Id.*).

Defendants now move for (1) dismissal of claims against certain MPB defendants as barred by the statute of limitations; (2) dismissal of claims against MDOC defendants for failure to allege personal involvement in any unconstitutional conduct; and (3) summary judgment on most claims against MDOC defendants for failure to exhaust

---

[2] Although not specifically addressed in the screening order, Carter could not proceed his on official capacity claims for money damages under the ADA and RA, either, where they are based on an equal protection theory. *Tanney v. Boles*, 400 F. Supp. 2d 1027, 1044-45 (E.D. Mich. 2005) ("A Title II ADA claim against a government official in her official capacity for money damages is barred if it sounds in equal protection rather than due process.") (citing *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 811 (6th Cir. 2002); *see also Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) ("Because the standards under both [the ADA and RA] are largely the same, cases construing one statute are instructive in construing the other.")

administrative remedies.

### B.   Standards of Review

#### 1.   Motion to Dismiss

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers.  *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007).  Nonetheless, "[t]he leniency granted to pro se [litigants] . . . is not boundless," *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and "such complaints still must plead sufficient facts to show a redressable legal wrong has been committed."  *Baker v. Salvation Army*, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

5

## 2. Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558

(internal quotations omitted).

## C.    Analysis

Before addressing the merits of Defendants' arguments, it is worth clarifying a few preliminary matters.   First, in their motion, Defendants "concede that parole board decisions are not grievable, and that Carter can proceed on his claims which accrued after February 23, 2018, against MPB defendants Eagen, King, Warchock, and Flanagan." (ECF No. 28, PageID.209).   Thus, such claims are not at issue here and should proceed to the discovery stage.   Second, in his complaint, Carter expressly states that, as to his claims against MDOC defendants, Washington "is being sued in her official and individual capacities *for damages, and for injunctive relief and declaratory relief*," but McKee and Dawdy are only "being sued in [their] official and individual capacities *for damages.*" (ECF No. 1, PageID.3, ¶¶9-11) (emphasis added).   Thus, the specific claims at issue in Defendants' instant motion are limited to Carter's (1) § 1983 claims against MDOC defendants Washington, McKee, and Dawdy in their individual capacities for money damages; and (2) official capacity claims for prospective relief under § 1983, the ADA, and the RA against MDOC defendant Washington and MPB defendants Callejas, Brown, Bonito, Sampson, Shipman, Jennings, and Warfield.

Regarding these claims, Defendants set forth three arguments.   First, Defendants argue that the claims against MPB defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield are subject to dismissal due to being barred by the three-year statute of limitations for personal injury claims.   Second, Defendants argue that claims against MDOC defendants Washington, McKee, and Dawdy should be dismissed for

failure to allege their personal involvement in any unconstitutional conduct.   Third, Defendants argue that, as to the claims against Washington, McKee, and Dawdy, Carter only exhausted his administrative remedies for his claims related to visiting restrictions, and so they seek summary judgment on any other remaining claims against the MDOC defendants for failure to exhaust administrative remedies.   The Court addresses each argument in turn.

### 1.  Statute of Limitations

Defendants first argue that "in Michigan, the three-year personal-injury limitations period applies to civil rights claims," which "begins to run when the plaintiff knows or has reason to know that the act providing the basis of his [] injury has occurred."  (ECF No. 28, PageID.196-97).  They contend that, here, Carter filed his complaint on February 23, 2021, so "any claims which accrued before February 23, 2018, are subject to dismissal." (*Id.*, PageID.197).  Defendants identify the claims that accrued before February 23, 2018 as those against MPB defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield because such claims arise out of "their parole decisions which took place before February 23, 2018."  (*Id.*, PageID.198).[3]

In § 1983 cases, federal courts apply their state's statute of limitations for personal injury cases.  *Wilson v. Garcia*, 471 U.S. 261, 272 (1985).  In Michigan, the applicable

---

[3] As noted above, Defendants concede that "Carter can proceed on his claims which accrued after February 23, 2018, against MPB defendants Eagen, King, Warchock, and Flanagan" (ECF No. 28, PageID.209), *i.e.*, claims raised in Carter's complaint concerning parole board decisions on August 6, 2018, May 5, 2020, and December 5, 2020 (ECF No. 1, PageID.13-14).  Thus, claims against MPB defendants Eagen, King, Warchock, and Flanagan which accrued after February 23, 2018 are not at issue here and should proceed to the discovery stage.

statute of limitations is three years.  *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d

417, 430 (6th Cir. 2016).  Federal law governs the accrual date for the statute of limitations.

*Wallace v. Kato*, 549 U.S. 384, 387-88 (2007).  For claims under § 1983, "the statute of

limitations period begins to run when the plaintiff knows or has reason to know that the act

providing the basis of ... [the] injury has occurred."  *Cooey v. Strickland*, 479 F.3d 412,

416 (6th Cir. 2007).  Moreover, this same three-year limitations period applies to Carter's

claims under the ADA and RA.  *See Fox v. Michigan Dep't of Corr.*, No. 08-CV-14410,

2010 WL 726517, at *3 (E.D. Mich. Feb. 24, 2010) (quoting *Lewis v. Fayette County Det.

Ctr.*, 2000 WL 556132, at *2 (6th Cir. Apr. 28, 2000) ("[C]ourts faced with ADA or

Rehabilitation Act claims have also looked to the state's statute of limitations of personal

injury actions.") (citing cases)).

In response to Defendants' motion, Carter does not dispute that the challenged

conduct underlying his claims against MPB defendants Brown, Callejas, Bonito, Sampson,

Shipman, Jennings, and Warfield occurred before February 23, 2018.  Instead, he argues

that the "continuing violation" doctrine applies "in such a way as to toll the limitation

period" because he showed that "he was subjected to an 'ongoing policy' of

discrimination."  (ECF No. 31, PageID.376).  "A 'continuous violation' occurs, and will

extend the limitations period, if the defendant engages in continuing wrongful conduct;

injury to the plaintiff accrues continuously; and had the defendant at any time ceased its

wrongful conduct, further injury would have been avoided."  *Goldsmith v. Sharrett*, 614 F.

App'x 824, 827 (6th Cir. 2015).  Importantly, however, "plaintiffs are [] precluded from

establishing a continuing violation exception by proof that the alleged acts of

discrimination occurring prior to the limitations periods are sufficiently related to those occurring within the limitations period." *Id.* In other words, "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [limitations period] after the discrete discriminatory act occurred." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Moreover, "[c]ourts have been 'extremely reluctant' to extend the continuing-violation doctrine beyond the context of Title VII." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 257 (6th Cir. 2014).

Here, because Carter filed his complaint on February 23, 2021, his claims against MPB defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield must have been premised on conduct that occurred on or after February 23, 2018 due to the three-year statute of limitations for personal injury claims. Carter alleges in his complaint that "[o]n *August 22, 2012* while housed at the Michigan Reformatory," defendants Brown and Callejas allegedly conducted his parole interview, denied his request "for an accommodation," did not "request that [he] receive a psychological evaluation even though he had been hospitalized eight months earlier as a result of his mental disability," and "used inaccurate information and issue[d] [him] a 12-month continuance of further incarceration as disciplinary treatment for mental illness." (ECF No. 1, PageID.13) (emphasis added). Next, Carter contends that "[o]n *September 15, 2014* while housed at the Marquette Branch Prison," defendants Bonito and Callejas engaged in similar conduct that led to the denial of his parole and a "12-month continuance of unnecessary

10

incarceration." (*Id.*) (emphasis added). Then "[o]n ***August 31, 2015*** while housed at the Marquette Branch Prison," defendants Sampson and Shipman allegedly denied Carter parole without an interview and used false information to issue him a 24-month continuance of incarceration. (*Id.*) (emphasis added). Finally, "[o]n ***October 13, 2017*** while housed at Macomb Correctional Facility," defendants Jennings and Warfield interviewed Carter for parole while he was "enrolled in an inpatient mental health treatment program." (*Id.*, PageID.13-14) (emphasis added). Carter alleges that, even though his psychologist "attended the hearing" and "notified Defendants that [Carter] was medication compliant and [] can safely be managed on parole," Warfield merely stated that he was "documenting" the psychologist's recommendation, denied Carter's request for D-47 parole, and issued a 12-month continuance of incarceration using false information. (*Id.*, PageID.14).

Based on the above allegations, the incidents underlying Carter's claims against MPB defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield clearly occurred between August 2012 and October 2017. Thus, Carter's claims based on those incidents accrued before February 23, 2018. Carter's reliance on the continuing violations doctrine for tolling of the limitations period lacks merit, as his claims as alleged are in fact challenges to individual, discrete acts. Specifically, Carter himself asserts that "members of the Michigan Parole Board have denied him release on parole seven times: in 2012, 2014, 2015, 2017, 2018, and twice in 2020 because of a disability," each of which took place in front of a different parole panel, at a different time, and mostly at different

facilities.   (ECF No. 31, PageID.376; *see also* ECF No. 1, PageID.13-14).[4]   Such allegations make clear that his claims are based on "a series of discrete, easily identifiable incidents—i.e., individual [parole interviews] followed by individual [parole denial decisions]," and not a "continuing violation."   *Goldsmith*, 614 F. App'x at 828-29 ("[T]he Supreme Court contrasted a continuing violation with discrete acts that are 'easy to identify.'   Continuing violations in the Section 1983 context are akin to hostile-work environment claims where the harm 'cannot be said to occur on any particular day' and individual incidents are not actionable on their own.").   Indeed, there is no reason Carter could not have filed individual lawsuits challenging each of those allegedly wrongful decisions.   Because even a generous reading of Carter's complaint "reveals a host of significant discrete events," *Goldsmith*, 614 F. App'x at 829, his pre-February 23, 2018 claims against MPB defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield are not subject to tolling under the continuing violation doctrine and should be dismissed as barred by the three-year statute of limitations.

### 2.  Claims against Defendants Heidi Washington, Kenneth McKee, and David Dawdy

#### i.  Allegations in Carter's Complaint

As an initial matter, it is necessary to clarify the substance of Carter's claims against MDOC defendants Washington, McKee and Dawdy.   In his complaint, Carter makes allegations against these MDOC defendants by referring to certain "policies and practices"

---

[4] Again, Defendants concede that Carter's claims against MPB defendants Eagen, King, Warchock, and Flanagan arising out of parole decisions on August 6, 2018, May 5, 2020, and December 5, 2020 are not time-barred.   (ECF No. 28, PageID.209; *see* ECF No. 1, PageID.13-14).

that have allegedly resulted in his being disparately affected as a mentally disabled prisoner, or not being provided with certain "accommodations" for his disability-related needs.  Importantly, though, rather than challenging the substance of these MDOC policies, Carter takes issue with the conduct of certain subordinate MDOC officials who "***are not functioning as the policy intended***" or "***failing to adhere to***" such policies.  (ECF No. 1, PageID.18, ¶¶ 65-66; *see also id.*, PageID.8 ("These systemic deficiencies are major failures with the accommodative regime, thus creating *a schi[s]m between MDOC policy and its actual effect*") (emphasis added)).

As best as can be discerned, the gravamen of Carter's claims is that he was not provided with "access to the services identified" in MDOC Policy Directive ("PD") "03.03.105 'Special Provisions For Prisoners With A Mental Disability,' and [therefore] continue[s] to subject[ed] [] to punitive treatment for exhibiting symptoms of mental illness." (ECF No. 1, PageID.18, ¶64).  Specifically, he alleges PD 03.03.105 states that "[a] prisoner with a mental disability is not responsible for misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of mental disability," and that if this policy were properly followed, he would have been determined to be "not responsible" for the behavior that prompted the issuance of his misconduct reports.  (*Id.*, PageID.6, ¶21).  Carter alleges that, contrary to policy, "MDOC officials have issued [him] over 330 misconduct reports as a result mental illness" without a single finding that he was "not responsible" because "[w]hen a mentally disable[d] prisoner in MDOC is written a misconduct report, the ticket is sent to a mental health therapist who falisf[ies] or rubber stamp[s] the

misconduct assessment, stating that the prisoner is responsible for his conduct" without even evaluating the prisoner's "mental state." (*Id.*, PageID.7, ¶¶23-26).[5]

Based on the above "practice," Carter alleges that Washington and Dawdy "continue to exclude [him] from enjoying the benefit of these services," *i.e.*, a finding of "'not responsible' according to MDOC policy." (ECF No. 1, PageID.7, ¶¶23-24). More specifically, he faults Washington and Dawdy because their "fail[ure] to train and supervise their employees [] has, and continues to cause MDOC officials to issue mentally disable[d] prisoners misconduct reports as pretext to discriminate against [them] by virtue of their mental disabilities," and because Washington and Dawdy "have a practice of ignoring violations of 03.03.105 with impunity." (*Id.*, PageID.7-8, ¶23). As a result, Carter alleges that he has been issued 330 "sham" misconduct reports and sanctioned for behavior that he should not have been found to be responsible for according to PD 03.03.105.

For example, he contends that he has been housed for over 10 years at a maximum-security facility "due to points he incurred based on sham misconduct reports that should have not been processed," and he faults Washington and Dawdy for their "fail[ure] to

---

[5] While Carter alleges that "MDOC officials have issued [him] over 330 misconduct reports as a result of mental illness," he did not provide any details as to the behavior arising from "symptoms of mental illness" for which he was issued misconduct reports and sanctioned. (PageID.7). Without any such details, his generalized allegations that Washington and Dawdy "ha[ve] an illegal practice of punishing mentally disable[d] prisoners for behavior or symptoms known to be related to mental illness, despite the prohibition on such punishment set forth in [PD] 03.03.105" (PageID.6, ¶ 21) are conclusory. In similar fashion, though he alleges that mental health officials rubber stamp misconduct assessments, he alleges no facts detailing a single specific instance of such conduct. (PageID.7, ¶ 25). Indeed, it appears the only claim that provides at least *some* level of factual detail regarding a specific incident of being sanctioned for behavior allegedly arising out of a mental illness is Carter's allegation that he received "two substance abuse misconduct violations" for "abusing prescribed medication," even though "[m]entally disable[d] prisoners often abuse medication due to impaired judgment and behavior." (PageID.10-11, ¶¶33- 34).

implement written policies and screening procedures to ensure that seriously disabled prisoners are not placed in maximum facility." (ECF No. 1, PageID.11). Carter also alleges that, even though "[m]entally disable[d] prisoners often abuse medication due to impaired judgment and behavior," Washington and McKee nonetheless "implemented and enforced a permanent ban of [Carter's] visiting privileges for misconduct [of] abusing prescribed medication" pursuant to their authority under PD 05.03.140 "Director Restriction of All Prisoner's Visits," paragraph CCC, which states that "the Director may restrict all of a prisoner's visits if the prisoner is convicted or found guilty of ... [t]wo or more violations of the Class I misconduct charge of substance abuse that occurred within five years of each other and do not arise from the same incident." (*Id.*, PageID.9-10). He alleges that despite their "authority to restore [his] visitation rights after one year after the imposition of the restriction," Washington and McKee "refuse to do so because of [his] disability and fail to provide reasonable accommodations to ensure these rules do not discriminate against him." (*Id.*, PageID.10).

ii. Defendants' Motion to Dismiss for Failure to Allege Personal Involvement

In seeking dismissal of the claims detailed above, Defendants' motion does not mention Carter's ADA and RA claims against Washington in her official capacity for prospective relief, much less present specific arguments as to why such claims are subject to dismissal. Instead, they argue only that "Carter fails to state how Washington, McKee, or Dawdy were personally involved in any unconstitutional conduct" as required for a *§ 1983 claim*, and that there are no specific allegations as to how they "either encouraged

the specific incident of misconduct or in some other way directly participated in it." (ECF No. 28, PageID.201-03) (quotations omitted).[6]  As such, the only issue raised in Defendants' motion is whether Carter's § 1983 claims against Washington, McKee, and Dawdy in their individual capacities for damages are subject to dismissal for failure to allege personal involvement.  In response to Defendants' motion, Carter asserts that he made a "clear showing that each named Defendant was personally involved in the activity that forms the basis of the complaint." (ECF No. 31, PageID.377-78).[7]

---

[6] Defendants' briefing makes clear that their arguments regarding Carter's failure to allege personal involvement in any unconstitutional conduct are entirely focused on § 1983 liability. (*See* ECF No. 28, PageID.198-203; *see also* ECF No. 32, PageID.403 ("as Defendants argued in their brief, liability *under § 1983* cannot rest on respondeat superior . . .) (emphasis added)).  It is worth noting, however, that the Sixth Circuit has recently held "vicarious liability does not apply to Title II of the ADA or § 505 of the Rehabilitation Act." *Jones v. City of Detroit, Michigan*, 20 F.4th 1117 (6th Cir. 2021), *cert. denied sub nom*. *Jones, S. Baxter v. Detroit, MI*, No. 21-1292, 2022 WL 4651340 (U.S. Oct. 3, 2022); *see also Ingram v. Kubik*, 30 F.4th 1241 (11th Cir. 2022).  But, again, on their *own* motion to dismiss, Defendants wholly fail to specifically address Carter's claims under the ADA or RA.  Rather than attempt to fully resolve these issues *sua sponte*, the Court will allow the remaining defendants to raise the issues through a proper motion should they so desire, which will also give Carter an opportunity to formally present any counterarguments.

[7] Carter also argues that this Court's prior screening order already "determined that [his] allegations are sufficient to state a claim." (ECF No. 31, PageID.377).  Such argument is simply inaccurate, as the Court's prior screening did not specifically address the sufficiency of his § 1983 claims, and only dismissed certain claims based on immunity and as barred by the ADA or RA. (*See* ECF No. 8).  In any case, "[t]he fact that [a court] permitted a [] claim to proceed beyond the screening stage does not preclude the subsequent dismissal of the same claim upon an appropriate motion [to dismiss]." *Hunter v. Ervin,* No. 1:19-CV-204, 2020 WL 2838509 (S.D. Ohio May 31, 2020) ("It is true that the legal standard of review for failure to state a claim under [] Rule 12(b)(6) is technically the same as the standard of review for failure to state a claim under 28 U.S.C. §§ 1915(e) or 1915A.  However, the frame of reference differs significantly.  Screening under 28 U.S.C. § 1915(e) is extremely liberal.  The perspective of this Court, as a neutral arbiter examining the complaint on a superficial level without benefit of briefing, differs from that of an opposing party who has an incentive to explore all possible legal arguments in a subsequent motion to dismiss . . . ."); *see also Stansell v. Grafton Corr. Inst.*, No. 1:17-CV-1892, 2019 WL 6609676, at *3-4 (N.D. Ohio Dec. 5, 2019) (rejecting plaintiff's argument that defendant's motion to dismiss must be denied where the Sixth Circuit determined his complaint could proceed past the § 1915(e)

To establish an Eighth Amendment violation, a prisoner must demonstrate that he was deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "Alleging that prison conditions 'are restrictive and even harsh' does not suffice because such conditions 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Harden–Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir.2008) (quoting Rhodes, 452 U.S. at 347). "Because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment Claim." *Id*. at 795 (quoting *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir.2003)).

As for an equal protection violation under the Fourteenth Amendment, the threshold element of such claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator ... must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).

---

screening stage because a "§ 1915(e) screening determination is a preliminary and interlocutory holding, subject to revision at any time prior to entry of final judgment.").

Importantly, however, in order to demonstrate liability under § 1983 in the first place, a plaintiff must first establish that *each named defendant* acted under color of state law and that *his or her* actions violated rights secured by the Constitution and/or laws of the United States.  *See Baker v. McCollan*, 443 U.S. 137 (1979).  Moreover, § 1983 liability cannot be premised upon mere allegations of *respondeat superior*; rather, in order for a party to be held liable under § 1983, there must be a showing that the party personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008).

In other words, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir.1982).   Likewise, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act."  *Id.* (quotations omitted); *see Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1998) ("At best, [Plaintiff] has merely claimed that the [supervisory officials] were aware of alleged harassment, but did not take appropriate action.  This is insufficient to impose liability on supervisory personnel under § 1983.").  Analyzed against these standards, except for his claim related to visiting restrictions, Carter fails to allege that Washington, McKee, and Dawdy were *personally*

18

involved in the alleged unlawful issuance of sham misconduct reports and/or his subsequent sanctions of being placed in a maximum facility or punitive segregation.

As detailed above, Carter's complaint essentially alleges that, despite PD 03.03.105's prohibition against punishing mentally disabled prisoners for behavior arising out of mental illness, he was given 330 misconduct reports and sanctioned for conduct caused by his mental illness.  But, to the extent any of Carter's constitutional claims are based on the alleged failure to follow MDOC policy, those claims fail as a matter of law because "the failure of a prison, or the state, to follow its own policies and procedures does not amount to a constitutional violation."  *Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005); *see also Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir.1994) (prison regulations "do not create an independent federal due process liberty interest or right in the prisoner.").

In any case, nowhere does Carter allege that Washington, Dawdy, or McKee – who are Directors over the MDOC as a whole – were *personally* involved in the issuance of any of the "330" misconduct reports he allegedly received during his time at individual MDOC facilities.[8]  To the contrary, the complaint makes clear that these misconduct reports were

---

[8] Defendants attach to their reply brief a copy of PD 03.03.105 "Prisoner Discipline," which states that "[a] Misconduct Report may be written by any Department staff person or person under contract with the Department who has knowledge that misconduct has occurred."  (ECF No. 32-1, PageID.412, ¶ D).  As noted earlier, the complaint contains no specific factual allegations as to the underlying behavior of the misconduct reports, much less that Washington, McKee, and Dawdy were directly involved in issuing such reports.  PD 03.03.105 also states under "Misconduct Sanctions" that "[u]pon a finding of guilt in a misconduct hearing, ***the hearing officer*** shall impose one or more of [] sanctions," and that "***[t]he Warden*** may reverse a hearing officer's decision, and may order a rehearing, on his or her own initiative."   (ECF No. 32-1, PageID.421, ¶ KKK, PageID.423, ¶ XXX).

issued by certain unnamed subordinate "MDOC officials" and rubber stamped by "mental health therapist[s]," and that Washington, Dawdy, and McKee were involved only to the extent that they "failed to train and supervise their employees that has, and continues to cause [subordinate] *MDOC officials* to issue mentally disable[d] prisoners misconduct reports as pretext to discriminate against by virtue of their mental disabilities." (ECF No. 1, PageID.7 (emphasis added); *see also id.* ("MDOC officials are not trained on how to handle mentally disable[d] prisoners")). Such claims premised on a failure to train are insufficient as a matter of law because Carter has not alleged facts demonstrating that Washington, McKee, or Dawdy "either *encouraged the specific incident of misconduct* or in some other way *directly participated in it.*" *Shehee*, 199 F.3d at 300 (6th Cir. 1999) (emphasis added).

A similar analysis applies to Carter's assertions that his placement in a maximum security facility or segregation is "an illegal practice of punishing mentally disable[d] prisoners for behavior or symptoms known to be related to mental illness." Again, Carter fails to allege that Washington, Dawdy, or McKee were directly involved to any extent in the decision to house him at such a facility or in such a manner. *Shehee*, 199 F.3d at 300 (quotations omitted). Rather, Carter faults them because he was sanctioned "*despite the prohibition*" against "punishing mentally disable[d] prisoners for behaviors or symptoms known to be related to mental illness . . . [as] set forth in [PD] 03.03.105," and because Washington and Dawdy "have a practice of ignoring violations of 03.03.105 with

impunity." (*Id.*, PageID.6) (emphasis added).[9] But the law is clear that "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act" or "to supervise, control, or train the offending individual." *Shehee*, 199 F.3d at 300. Simply put, Carter at best alleges that supervisory officials were "aware of alleged [discriminatory misconduct], but did not take appropriate action[,] [which] is insufficient to impose liability on supervisory personnel under § 1983." *Poe*, 853 F.2d at 429. Thus, because Carter's claims against Washington, McKee, and Dawdy for the issuance of misconduct reports and placement in maximum security/segregation are all based on a theory of *respondeat superior* without sufficient allegations of personal involvement, such claims should be dismissed.[10]

---

[9] Similarly, to the extent Carter asserts that Washington and McKee "failed to implement written policies and screening procedures to ensure that seriously disabled prisoners are not placed in maximum facility," (ECF No. 1, PageID.11), and that PD 05.01.130 "Prisoner Security Classification" has a "disparate impact on mentally disable[d] prisoners . . . because the vast majority of mentally ill prisoners . . . cannot remain misconduct free in order to reduce their points for transfer to a lower security level" (*id.*, PageID.9), such assertions overlook and are contradicted by his own allegations that there is a special policy, PD 03.03105, which *prohibits* the punishment of prisoners for behaviors resulting from mental illness, or in other words, prohibits mentally ill prisoners from gaining points in the first place for such alleged misconducts. (*Id.*, PageID.6).

[10] It is worth noting that to the extent Carter alleges that Washington and Dawdy have "failed to provide [him] appropriate mental health treatment and subject him to inappropriate disciplinary treatment in lieu of providing that treatment," his own grievance in ICF-20-04-0548-28B acknowledges that "[e]ach time [he] experiences a severe episode he is transferred to a Level IV Residential Treatment Program for ***intensive mental health treatment***," and that it is only after he "completes the Residential Treatment Program [that] he is transfer[red] back to a Level V Maximum Facility . . ." (ECF No. 1, PageID.33) (emphasis added). In his own words, Carter received *intensive* mental health treatment, and to the extent he disputes its adequacy, he "has not [demonstrated] a deliberate indifference to [his] needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk by failing to take reasonable measures to abate it. Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment

Unlike his claims concerning misconduct reports and his placement in maximum security or punitive segregation, Carter appears to have sufficiently alleged Washington's and McKee's direct involvement in imposing a permanent visiting restriction.  (ECF No. 1, PageID.9-10).  Defendants do not at all address this specific claim and instead rely on their broader argument that Carter failed to allege personal involvement as a general matter.  But a review of the complaint reflects allegations that it was specifically *Washington* and *McKee* who "implemented and enforced a permanent ban of [Carter's] visiting privileges for misconduct unrelated to a visit, abusing prescribed medication" under the unique authority granted to them as "Directors," pursuant to "MDOC Policy Directive 05.03.140 '***Director['s]*** Restriction of All Prisoner's Visits,'" which provides that "***the Director*** may restrict all of a prisoner's visits if the prisoner is convicted or found guilty of ... [t]wo or more violations of the Class I misconduct charge of substance abuse that occurred within five years of each other and do not arise from the same incident."  (*Id.*, PageID.10) (emphasis added).  He also alleges that only Washington and McKee have the "authority to restore [his] visitation rights after one year after the imposition of the restriction."  (*Id.*).  In other words, Carter has alleged that Washington and McKee are the only ones who had the authority as Directors under PD 05.03.140 to directly impose (or remove) a permanent restriction on his visitations as punishment for behavior stemming from his mental illness.  Because Carter has alleged Washington's and McKee's personal involvement, and Defendants have not otherwise presented any substantive arguments as to the merits of this

---

generally fail to state an Eighth Amendment claim of cruel and unusual punishment."  *Broyles*, 478 F. App'x at 975 (internal quotations omitted).

claim, Defendants are not entitled to dismissal of Carter's visiting-restrictions claim against Washington and McKee.

### 3. Exhaustion

#### i. Exhaustion Requirements

Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action, "under [§ 1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court. *See Woodford*, 548 U.S. at 89. The Supreme Court has held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93. Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. In determining whether a plaintiff has properly exhausted his claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 200 (2007). Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof. *See id.* at 216; *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

In Michigan's correctional facilities, prisoner grievances are generally governed by MDOC PD 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Grievance Policy"). (ECF No. 28-3, PageID.223). A state prisoner must first complete the process outlined in

the Grievance Policy – including pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct. (*Id.* at ¶ C). If a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance. (*Id*. at ¶¶ Q, W). If the prisoner is dissatisfied with the Step I response, he may submit a grievance appeal to the Step II Grievance Coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due. (*Id*. at ¶ DD). If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id*. at ¶ HH). Again, an inmate may only pursue a claim in court if he has complied with his obligations at each of these three steps. (*Id.* at ¶ C).

In their motion, Defendants argue that "[a]s for the claims against MDOC Defendants Washington, McKee, and Dawdy, [] the only claims which Carter exhausted were those he raised in the Step I grievance for [ICF-0547] . . . , i.e., that he had been subject to visiting restrictions due to misconducts," and that "[b]ecause Carter did not pursue any grievances on his other claims against Washington, McKee, or Dawdy, those claims are subject to dismissal." (*Id.*, PageID.210). In other words, Defendants concede that Carter exhausted his claims against Washington and McKee concerning visitation restrictions, but argue that his claims challenging his placement in a maximum security facility are unexhausted.

In response, Carter argues that he exhausted his "claim that Defendants unlawfully subjected him to Level 5 maximum facility" through Grievance ICF-2020-04-0548-28B

(the "0548-Grievance"), which he contends he pursued "through Step I through Step III, in which MDOC officials rejected as vague, and Step III respondents failed to respond to." (ECF No. 31, PageID.379-80). Defendants reply that, contrary to Carter's assertions, the 0548-Grievance "does not appear on Carter's Step III grievance report [], and nothing in the record indicates that he filed [the 0548-Grievance] at Step III." (ECF No. 32, PageID.406-07).

A review of the salient grievance documents concerning the 0548-Grievance reflects that, at Step I, Carter grieved the following issue:

> This Grievance is written against **MDOC Director Washington**; **Mental Health Director Dawdy**; ICF Warden; ICF Mental Health Unit Chief; ARF Warden and Unit Chief; MRF Warden and Unit Chief; for **violations of the U.S. Constitution and the Americans with Disabilities Act**. Grievant suffers from serious mental illness and has a history of hospitalization and placement in Residential Treatment Programs. **Grievant is currently housed in a Level V Maximum Facility and has been subject to such conditions for ten years, which is known to exacerbate mental illness**. Each time Grievant experiences a severe episode he is transferred to a Level IV Residential Treatment Program for intensive mental health treatment. Once Grievant completes the Residential Treatment Program he is transfer[red] back to a Level V Maximum Facility – subject to the exact same conditions that necessitated his placement in the mental health program. **The above officials ha[ve] a state wide policy and practice of housing mentally-ill prisoners in Maximum facilities.**

(ECF No. 1, PageID.33). The 0548-Grievance was rejected at Step I for "one of the following reasons, which are vague, illegible or it contains extraneous information, Per PD 03.02.130. . . . Grievance is rejected at Step I as vague/unclear." (ECF No. 1, PageID.34). In his Step II appeal, Carter wrote that he "re-states the allegation set forth in his Step I Grievance" and argued that "[i]n addition, the Step I was wrongfully rejected on improper

reasons." (*Id.*, PageID.36).  The Step II Grievance Appeal Response states only that "[t]he Step I rejection has been reviewed by the Warden's Office . . . and the rejection is upheld at Step II." (*Id.*, PageID.37).  After the Step II response was returned to Carter on May 1, 2020, his "Prisoner/Parolee Grievance Appeal Form" indicates that he appealed to Step III, stating, "Grievant re-states his Step I and II allegations." (*Id.*, PageID.36).  This is then followed by a letter labeled "Re: ICF 2004 0548 28B," dated "June 25, 2020," and addressed to "Step III Appeal, Director's Office, P.O. Box 30003, Lansing, MI 48909." (*Id.*, PageID.38).  The letter states, "I mailed a Step III Grievance on 5/5/20, and have yet to receive a response.  The Step I Grievance Coordinator wrongfully rejected my grievance regarding my placement in maximum facility." (*Id.*).

Defendants make no attempt whatsoever to explain why, or what part of, the 0548-Grievance was "vague/unclear" so as to meet *their* initial burden to show that the grievance was *properly* rejected.[11]  When viewing the evidence in the light most favorable to Carter and drawing all reasonable inferences in his favor, the 0548-Grievance at a minimum complains that the "practice of housing mentally-ill prisoners in maximum facilities" "exacerbates [his] mental illness," which violates his constitutional and ADA rights as a prisoner who "suffers from serious [mental] illness." (ECF No. 1, PageID.33).  Defendants

---

[11] Defendants' cursory argument that the 0548-Grievance "could not have exhausted any claims because it was rejected at Step I" lacks merit.  A defendant cannot show a failure to exhaust simply by showing a grievance was "rejected."  In *Johannes v. Washington*, No. 14-11691, 2016 WL 1253266, at *6 (E.D. Mich. Mar. 31, 2006), the court was addressing an argument that, merely because a grievance had been rejected as "duplicative" of a prior grievance, the inmate had not exhausted the second one.  The court rejected that argument, explaining, "If this were the case, a prisoner would be barred from filing suit even if the grievance screener incorrectly rejects his grievance as duplicative." *Id.*

notably present no arguments as to the merits of the 0548-Grievance and its rejection, and instead merely contend that the 0548-Grievance was not exhausted through Step III.

But even as to the Step III argument Defendants do raise, there exist material factual questions as to whether Carter actually pursued the 0548-Grievance through Step III of the grievance process. Defendants themselves concede that Carter "has produced the purported Step III grievance appeal for [the 0548-Grievance]" (ECF No. 32, PageID.406-07), and their assertion that "this document does not bear any indication that it was received by MDOC" does not mean *Carter* did not *mail* the Step III grievance appeal as he was required to do. Indeed, PD 03.02.130 merely states that a grievant "must *send* a completed Step III grievance, using the Prisoner/Parolee Grievance Appeal form [], to the Grievance and Appeals Section within ten business days after receiving the Step II response . . ." (ECF No. 28-3, PageID.229, ¶ HH). Defendants otherwise have not shown that such mailing could not have been lost during its delivery or that the MDOC simply failed to log the grievance upon receipt. And, contrary to their assertion that "Carter has not produced any evidence to show that he filed the document," he has attached a copy of a letter he purportedly mailed to the Step III Appeal Director's Office in Lansing, which states he timely mailed his Step III Grievance on May 5, 2020 but had not yet received a response.

Based on all of the above, a material question of fact exists as to whether Carter properly pursued the 0548-Grievance through Step III of the grievance process and, thus, whether he properly exhausted his claims against Washington and Dawdy regarding his placement as a mentally disabled prisoner in a maximum facility. Thus, Defendants' request for summary judgment on Carter's claims regarding his placement in a maximum

27

facility for failure to exhaust should be denied.  Because Carter has only alleged official capacity claims for prospective relief against Washington among the MDOC defendants, he should be allowed to proceed only on his ADA and RA claims regarding his placement in a maximum facility against Washington in her official capacity for prospective relief.

## III.    CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss and for Summary Judgment on the Basis of Exhaustion **(ECF No. 28)** be **GRANTED IN PART AND DENIED IN PART** as follows:

- **Deny** Defendants' request for summary judgment on the basis of exhaustion;

- **Grant** Defendants' request for dismissal of Carter's § 1983 claims against Washington, McKee, and Dawdy regarding his placement in a maximum facility for failure to allege personal involvement; and

- **Grant** Defendants' request for dismissal of Carter's pre-February 23, 2018 claims against defendants Brown, Callejas, Bonito, Sampson, Shipman, Jennings, and Warfield as barred by the three-year statute of limitations**.**

If this recommendation is adopted, Carter's remaining claims in this case will include only his (1) § 1983 official-capacity claims for prospective relief against MPB defendants Eagen, King, Warchock, and Flanagan that accrued on or after February 23, 2018; (2) ADA and RA claims regarding his placement in a maximum facility against Washington in her official capacity for prospective relief; and (3) all claims related to visiting restrictions against Washington and McKee in their individual capacities for money damages, and Washington in her official capacity for prospective relief.

Dated: November 8, 2022                              s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## REVIEW

Either party to this action may object to and seek review of this Report and Recommendation ("R&R"), but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed .R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this R&R.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge.  E.D. Mich. L.R. 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this R&R to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email

or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 8, 2022.

s/Michael E. Lang
MICHAEL E. LANG
Case Manager