UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL CARTER,

                    Plaintiff,          Civil Action No. 21-10518

v.                                 Matthew F. Leitman
                                 United States District Judge

HEIDI WASHINGTON, *et al.*,     David R. Grand
                                 United States Magistrate Judge

                    Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 47)

    *Pro se* plaintiff Joel Carter ("Carter"), an incarcerated person, brings this civil rights action against numerous employees of the Michigan Department of Corrections ("MDOC") and Michigan Parole Board ("MPB") (collectively, "Defendants"), alleging that Defendants' policies and practices have a disparate impact on him and fail to accommodate his disability-related needs, and that Defendants also subjected him to cruel and unusual punishment for his symptoms of mental illness.  (ECF No. 1; *see also* ECF No. 8).[1]  The remaining defendants in this case are Heidi Washington, MDOC Director; Kenneth McKee, MDOC Deputy Director; Michael Eagan, chairman of the MPB; and current or former MPB members Anthony King, Sonia Warchock, and Timothy Flanagan.

    On May 25, 2023, Defendants filed a motion for summary judgment, along with a

_____

[1] The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b). (ECF Nos. 9, 49).

brief in support.  (ECF No. 47).  Carter filed a response (ECF Nos. 58, 61)[2], and Defendants filed a reply (ECF No. 62).

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. L.R. 7.1(f).  Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the Defendants' Motion **(ECF No. 47)** be **GRANTED IN PART AND DENIED IN PART.**

## II.   REPORT

### A.    Brief Procedural Background

Carter is a MDOC prisoner who is currently confined at the Carson City Correctional Facility.  On February 23, 2021, he filed this civil rights action, alleging violations of (1) his Eighth and Fourteenth Amendment rights brought under 42 U.S.C. § 1983[3]; (2) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and (3) Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

---

[2] Although Carter's filing (ECF No. 58) is entitled a "Motion for Judgment as a Matter of Law, and Response to Defendants' Motion for Summary Judgment," the Court construes it as a response to Defendants' motion (ECF No. 47).  Moreover, because Carter's filing did not include a written brief, the Court ordered him to file one, which he did on January 2, 2024. (ECF No. 61).

[3] "Section 1983 does not create rights itself; it authorizes a person to bring a claim against a person who, acting under color of law, violates one's rights established elsewhere, that is "by the Constitution and laws" of the United States." *Est. of Fluegge v. City of Wayne*, 442 F. Supp. 3d 987, 997 (E.D. Mich. 2020) (citing *Cavin v. Michigan Dep't of Corr.*, 927 F.3d 455, 460 (6th Cir. 2019).  For ease, however, the Court will refer to Carter's constitutional claims brought under Section 1983 as his "§ 1983" claims.

2

After initial screening of the complaint (ECF No. 8), and the adoption of this Court's prior Report and Recommendation (ECF Nos. 34, 36), Carter's remaining claims are: (1) ADA and RA claims regarding the issuance of misconduct reports against him and his placement in a maximum security facility and segregation against Washington in her official capacity for prospective injunctive relief; (2) § 1983 claims related to visiting restrictions against Washington and McKee in their individual capacities for money damages; (3) § 1983, ADA, and RA claims related to visiting restrictions against Washington in her official capacity for injunctive relief; and (4) official capacity claims for prospective injunctive relief under § 1983, the ADA, and the RA against MPB defendants Eagen, King, Warchock, and Flanagan that accrued on or after February 23, 2018.

Defendants now move for summary judgment on all of Carter's claims against them, arguing that that such claims fail as a matter of law and that they are entitled to qualified immunity. The Court has thoroughly reviewed the record in this matter, including the parties' briefs and supporting exhibits. Instead of summarizing that information here, the Court will make references and provide citations to the record as necessary in its discussion of whether summary judgment should be granted on Carter's claims, which will be addressed in turn below.

## B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*

*Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

> ### 1.  ADA and RA claims for prospective injunctive relief against Washington in her official capacity related to the issuance of misconduct reports against Carter and his placement in maximum

4

*security and segregation*

*Background*

First at issue are Carter's ADA and RA claims against MDOC Director Washington in her official capacity for prospective injunctive relief related to his continued receipt of misconduct reports and placement in a maximum-security facility and segregation. In this regard, Carter makes the following relevant allegations in his verified complaint:[4]

> Plaintiff suffers from Multiple Sclerosis ("MS"), a neurological condition that results in multiple and varied neurologic symptoms. As a result of multiple sclerosis, Plaintiff has been diagnosed by MDOC mental health officials with a variety of mental impairments, including "Psychosis Disorder Due to Multiple Sclerosis," a "Mental Disorder Due to Medical Condition," an "Obsessive Compulsive Disorder" ("OCD"), and a "Paraphilia Disorder" (Sexual Impulsivity). Plaintiff's documented symptoms include paranoia, hallucinations, mania, delusions, anxiety, depression, and thoughts of suicide.

> [] Plaintiff's mental disabilities result in compulsions, impulses, an inability to concentrate, make decisions, sleep, and uncontrollable crying. Plaintiff is on medication for his mental disabilities and is prescribed Risperidal for his psychosis, and Prozac for his sexual impulses.

> \* \* \* \* \* \*

> Defendant[] Washington [] has an illegal practice of punishing mentally disable[d] prisoners for behavior or symptoms known to be related to mental illness, despite the prohibition on such punishment set forth in MDOC Policy Directive 03.03.105, paragraph DDD through JJJ, "Special Provisions For Prisoners With A Mental Disability," . . . [which] states in part:

> > A prisoner with a mental disability is not responsible for

---

[4] Carter's verified complaint carries the same weight as would an affidavit for purposes of summary judgment. (*See* ECF No. 1, PageID.22); *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (explaining that where a party files a verified complaint, the allegations contained therein have the same force and effect as an affidavit for purposes of summary judgment).

misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of mental disability. Mental disability is defined as any of the following[] . . . [including] 1. Mental illness, which is substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or the ability to cope with the ordinary demands of life.[5]

. . . Plaintiff has a condition which meet[s] the definition of mental disability under MDOC policy "Special Provisions For Prisoners With A Mental Disability," but Washington [] continue[s] to exclude Plaintiff from enjoying the benefits of these services as a matter of policy because all mentally disable[d] prisoners housed with the MDOC are excluded from these services and are subject to intentional discrimination.

. . . MDOC officials [continue] to issue mentally disable[d] prisoners misconduct reports as pretext to discriminate against [sic] by virtue of their mental disabilities. MDOC officials are not trained on how to handle mentally disable[d] prisoners. . . . As a result, MDOC officials have issued Plaintiff over 330 misconduct reports as a result of mental illness. Not one instance during the 330 times Plaintiff received misconducts was he determined " not responsible" according to MDOC policy, even though the behavior Plaintiff received misconducts for has been specifically diagnosed by MDOC as symptoms of mental illness.

---

[5] The policy further provides that, "If the prisoner is determined to be not responsible for his/her behavior due to his/her mental disability, the Class I or Class II Misconduct Report shall not be processed. The prisoner's behavior, however, shall be documented as set forth in Paragraph JJJ. If the prisoner is believed to be responsible for his/her behavior, the matter may proceed to a hearing unless the prisoner is receiving inpatient mental health services, in which case the treatment team and/or Regional Corrections Mental Health Program Director shall first determine whether the misconduct process would be detrimental to the prisoner's mental health treatment needs; if it is determined to be detrimental, the misconduct shall not be processed." (ECF No. 61, PageID.1169, ¶ HHH). "If the prisoner is found guilty, the hearing officer may assign only the sanctions of loss of privileges and/or restitution, as appropriate; if loss of privileges is ordered, the privileges to be withheld shall be determined by the Director of the Corrections Mental Health Program or designee." (*Id.*, PageID.1169-70, ¶ III). "Whenever a Misconduct Report is not written or processed due to the prisoner's mental disability, including if it is not processed because the disciplinary process is determined to be detrimental to the prisoner's treatment needs, the prisoner's behavior shall be documented in the prisoner's health record and addressed therapeutically. (*Id.,*PageID.1170 ¶ JJJ).

[] When a mentally disable[d] prisoner in MDOC is written a misconduct report, the ticket is sent to a mental health therapist who falsif[ies] or rubber stamp[s] the misconduct assessment, stating that the prisoner is responsible for his conduct. Mental health officials who rubber stamped Plaintiff's misconduct assessments, found him responsible each instance of the alleged misconduct. . . . [] MDOC mental health officials ha[ve] an unlawful practice of conducting these sham misconduct assessments without any meeting or evaluation of a prisoner's mental state prior to the responsib[ility] determination. Mental health officials conducting responsibility determinations refuse to evaluate mentally disable[d] prisoners at or near the time of occurrence, resulting in unnecessary disciplinary action, contrary to MDOC policy.

[] Plaintiff has and continues to be sanctioned for symptoms of mental illness, by being subject to disciplinary and administrative segregation, and indefinitely placed in a Level 5 maximum facility. Plaintiff has spent over 6-years in segregation, even though MDOC mental health officials have determined that "segregation is problematic to [Plaintiff's] mental health." Plaintiff has spent 10-years in a maximum security facility as a result of this practice.

\* \* \* \* \* \*

Each instan[ce] Plaintiff is found guilty of misconduct, he is issued points. For 15-years Plaintiff has been classified for the maximum amount of misconduct points a prisoner can incur (thirty-five points). Most mentally disable[d] prisoners within the MDOC ha[ve] 35-points. These points adversely impact disciplinary decisions, and has caused Defendants to house Plaintiff in their highest security level, a Level 5 maximum facility and has actually affected Plaintiff's parole eligibility.

[] According to MDOC Policy Directive 05.01.130, "Prisoner Security Classification," a prisoner who has 23 through 35 points can be housed in a Level 5 facility. In order to be confined in a Level IV medium security facility, a prisoner must have 15 through 22 points. A prisoner must have 7-14 points for placement in a Level II, and 0-6 to be housed in a Level I. In order for a prisoner to reduce their points they must remain misconduct free for 6-months. Every 6-months misconduct free Defendants deduct 6 points. If a prisoner has 35 points, he must go approximately a year and a half without a misconduct for a reduction of his security level. This policy has a disparate impact on mentally disable[d] prisoners. This is because the vast majority of mentally ill

prisoners, such as Plaintiff[,] cannot remain misconduct free in order to reduce their points for transfer to a lower security level, which result in mentally disable[d] prisoners remaining in maximum facility.

[] Mentally disable[d] prisoners who ha[ve] or will experience bad days, weeks or months result in misconducts and multi-year stints or indefinite placement in maximum facility. These clustered sanctions punish mentally-ill prisoners for extended misbehavior much more harshly th[a]n non-disable[d] prisoners who can demonstrate positive behavior for prolonged periods. . . .

[] In Level 5, Plaintiff is subject to social isolation, sensory deprivation, and reduced environmental stimulation that approach the limits of human endurance. Plaintiff is entombed in a concrete cell 23 hours a day, seven days a week. Plaintiff is allowed limited congregate activities and very few privileges. Visiting is non contact and is severely restricted. . . . For 7-years Defendants have denied Plaintiff physical contact with his family members [since 2011 for two substance abuse misconduct violations]. Defendants continue to do this pursuant to a policy that has a disparate impact on him.

(ECF No. 1, PageID.4-10) (footnote added).

As best as can be discerned, Carter alleges that, since his incarceration in 2002, he has been issued misconduct tickets for certain behaviors that are the symptoms of his mental disabilities stemming from MS, in violation of the ADA and RA. He claims that this practice has led to him being assigned the maximum number of misconduct points – 35 – which are then used to impose a sanction of segregation and classify him for Level V placement at a maximum-security facility, where he is kept in his cell for 23 hours a day, and is allowed only limited congregate activities and very few privileges. Moreover, he claims that the MDOC requires that inmates be "misconduct free" for six months before it will deduct 6 misconduct points from his total misconduct points, but that this fails to accommodate him as a mentally disabled inmate because his mental disabilities often

8

manifest in behavioral symptoms for which he is wrongly being issued misconduct tickets. Carter contends that this effectively makes it impossible for him to receive a deduction in misconduct points unless he is able to suppress the symptoms of his mental disabilities for six months at a time.  Finally, he claims that MDOC Policy Directive 03.03.105, entitled "Prisoner Discipline," specifically contemplates "special provisions" or "accommodations" for the discipline of "prisoners with a mental disability,"[6] but that, in practice, he has not been afforded the benefit of such an accommodation because not once has he been found "not responsible" for a misconduct ticket that was based on behavior specifically diagnosed by the MDOC as symptoms of mental illness.

Based on the above alleged ADA and RA violations, Carter "seeks injunctive relief ordering Defendants, charged with implementing and enforcing MDOC services and programs[,] to provide [him] benefits to which he is entitled, and to expunge all misconduct guilty findings for violations of MDOC policy, as well as, state and Federal Laws," and to "[p]ermanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting [him] to the conditions described in this Complaint."  (ECF No. 1, PageID.2, 22).

*Analysis*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any

---

[6] *See* ECF No. 61, PageID.1169-70 ("Special Provisions for Prisoners With a Mental Disability" in P.D. 03.03.105).

such entity." 42 U.S.C. § 12132. In the ADA, the term "disability" is defined as follows: "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." *Id.* § 12102(2). Similarly, Section 504 of the RA protects any "otherwise qualified individual" from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under specified programs "solely by reason of her or his disability." 29 U.S.C. § 794(a). "Because claims brought under Title II of the ADA and § 504 of the RA require proof of substantially similar elements, courts often treat the two in the same manner and analyze ADA and RA claims together." *Gohl v. Livonia Pub. Sch.,* 134 F. Supp. 3d 1066, at 1074 (E.D. Mich. 2015).

ADA and RA protections apply to state prisoners. *Williamson v. Wheeler*, No. 22-4017, 2023 WL 5184714, at *2 (6th Cir. Aug. 9, 2023). "Two types of claims are cognizable under [ADA] Title II: claims for intentional discrimination and claims for a reasonable accommodation." *Id.* (citing *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017). Moreover, Title II's implementing regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.*, at *3 (citing 28 C.F.R. § 35.130(b)(7)(i)).

In their summary judgment motion, Defendants do not address the merits of Carter's ADA and RA claims. Instead, Defendants argue only that "Carter's ADA and RA claims [] fail as Carter cannot show that Washington was personally involved in issuing the

misconduct reports or of finding Carter guilty of misconduct violations, which Carter asserts led to him being placed in maximum facilities and/or segregation," and points to the Sixth Circuit's holding in *Jones v. City of Detroit*, 20 F.4th 1117, 1122 (6th Cir. 2021), that "vicarious liability does not apply to Title II of the ADA or § 505 of the Rehabilitation Act."  (ECF No. 47, PageID.680).

Carter responds that "Defendant Washington only argues personal involvement regarding [his] ADA and RA claims," but that "it is undisputed that since Defendant Washington has been sued in her official capacity regarding his unlawful placement in segregation and maximum facilities claims, [his] ADA claim is, for all intents and purposes, against the State of Michigan as the real party-in-interest" and therefore does not require a showing of personal involvement by Washington.  (ECF No. 61, PageID.1139-40).  After careful review of *Jones* and the law of this circuit, the Court agrees that Washington's argument based on vicarious liability is misguided as far as it relates to Carter's ADA and RA claims for *prospective injunctive relief.*

First, a careful reading of *Jones* does not foreclose Carter's ADA and RA claims against Washington for prospective injunctive relief based on his failure to allege her personal involvement.  In *Jones*, the Sixth Circuit addressed a plaintiff's failure-to-accommodate claim for *damages*[7] under the ADA and RA against defendant City of Detroit under a theory of vicarious liability for the actions of several of its police officers.  *Jones*,

---

[7] The district court in *Jones* made clear that it was only addressing Jones's claims for *damages*, and not his claim for *injunctive relief*, which had been bifurcated for separate resolution. *Jones*, 2019 WL 2355377, at *1.

20 F.4th at 1119.  The Sixth Circuit held that "vicarious liability does not apply to Title II

of the ADA or § 505 of the Rehabilitation Act," relying on the Supreme Court's holding in

*Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998), that "[a]bsent actual

notice and deliberate indifference on the part of district officials with the authority to

intervene , . . . the [plaintiff] did not have a ***claim for monetary damages***" under Title IX,

and concluding that "[w]hat was true for Title IX in *Gebser* is true for Title VI today." *Id.*

at 1120-21 (emphasis added).[8]  Unlike in *Jones*, Carter's remaining ADA and RA claims

are for prospective injunctive relief and not for monetary damages.

    Moreover, the Sixth Circuit has made clear that "[u]nder the case law of this circuit

and our sister circuits, the proper defendant under a Title II claim is the public entity or an

official acting in his official capacity." *Everson v. Leis*, 556 F.3d 484, 501 (6th Cir. 2009)

(citing *Carten v. Kent State Univ.*, 282 F.3d 396-97 (6th Cir. 2002); *see also Jones v.

Washington*, No. 1:23-CV-410, 2024 WL 242775, at *8 (W.D. Mich. Jan. 23, 2024) ("As

to Plaintiff's official capacity ADA and RA claims, the State of Michigan (acting through

the MDOC) is not necessarily immune from Plaintiff's claims under the ADA or the RA .

. . At this stage . . . the Court will not dismiss Plaintiff's ADA and RA claims against

Defendants Washington [and] McKee . . . in their official capacities").  In other words, a

suit against Washington in her official capacity is identical to a suit against the MDOC

---

[8] The Sixth Circuit further explained that Title IX "was enacted at a time when existing civil rights
statutes containing express rights of action authorized private claims for injunctive and equitable
relief, not monetary relief," and that the statute, which invoked Congress's Spending Clause
powers, was silent as to any "notice that noncompliance could open the door for liability in
damages," indicating that "Congress did not envision money-damages liability." *Id.* at 1120-21.

itself.  *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) (finding official-capacity suits against the defendant agency's employees superfluous where the state and agency were also named as defendants); *Thompson v. Washington*, No. 1:21-CV-683, 2022 WL 2128264, at *7 (W.D. Mich. June 14, 2022) ("A suit against an individual in his or her official capacity is equivalent to a suit brought against the governmental entity: in this case, the MDOC.").  As such, it follows that an ADA or RA claim against the MDOC does not necessarily require the "personal involvement" of Washington specifically.  *See Miller v. Calhoun Cty.*, 408 F.3d 803 (6th Cir. 2005) (determining that the lack of allegations that an official was personally involved in a violation indicated that the plaintiff's claim was against the defendants in their official capacities); *Taaffe v. Drake*, No. 2:15-CV-2870, 2016 WL 1713550, at *5 (S.D. Ohio Apr. 29, 2016) ("It is true that in a suit for money damages against a state official sued in his or her individual capacity, the plaintiff must allege that the defendant was personally involved in the actions constituting a violation of the plaintiff's constitutional or statutory rights. . . .  But when only prospective injunctive relief is requested, that type of showing is unnecessary.  The proper defendants in such an action are the ones who have the power to provide the relief sought, whether or not they were involved in the allegedly illegal conduct at issue."); *Rouse v. Washington*, No. 20-CV-11409, 2021 WL 2434196, at *10 n.11 (E.D. Mich. June 15, 2021) ("Even though Plaintiffs have failed to allege the named Defendants' personal involvement in the constitutional violations, these Defendants' lack of individual involvement is not a basis for dismissing the official capacity claims against them.").  Accordingly, Defendants are not entitled to summary judgment on Carter's official capacity claims for prospective

13

injunctive relief based on their argument that Carter failed to allege the personal involvement of Washington.

On the merits, Defendants, as the party moving for summary judgment, fail to meaningfully address Carter's ADA and RA claims related to misconduct tickets and placement in a maximum-security facility and segregation. Indeed, Defendants have not argued that Carter has failed to state viable ADA and RA claims in this regard, or to raise a material question of fact. Moreover, most of the record evidence on these claims was neither presented nor meaningfully addressed by Defendants. This alone is a sufficient basis to deny Defendants' motion for summary judgment on these claims.

Nonetheless, the Court notes that Carter has presented a lengthy record of evidence in the form of MDOC documents that, when viewed in the light most favorable to him and drawing all reasonable inferences in his favor, support his contentions in his verified complaint that he suffers from serious mental disabilities, that he is being punished for exhibiting symptoms of such disabilities without being afforded reasonable accommodations for mentally disabled inmates as contemplated by MDOC policy, and that this has resulted in him being placed in segregation and 23-hour per day lockdown in a maximum security facility, where he is allowed limited congregate activities, very few privileges, and otherwise denied access to various programs and services he could have participated in had he not been found guilty of such misconducts. The following evidence exemplifies the types of serious mental illnesses manifesting in behavioral symptoms for which Carter may have been issued misconduct tickets:

- MDOC's "CHJ-307 Comprehensive Psychiatric Examination" completed by

14

Kiritida A. Patel, M.D., on November 23, 2009, after Carter complained, "I see spiders and snake in my cell.  I bug out and act crazy by taking my clothes off."  The exam notes that "[i]nmate has multiple sclerosis [diagnosed in 2001] and is complaining of visual hallucinations," and "*[c]onsultation with MBP MSP states that at this stage of MS visual hallucinations can occur*." It also notes that "[i]nmate has accrued a number of sexual misconducts while incarcerated and *a new charge for indecent exposure—unknown if this is related to neurological pathology*."  During the examination, Carter reported that he was "recently informed by the neurologists that his MS was worsening" and complained that "*side effects due to Copaxone injections*" – a form of MS treatment –were "*leading to multiple sexual misconduct tickets for which he was not responsible*."  Carter also "verbalized auditory and visual hallucinations, [and] grandiose and bizarre delusions," and "*[h]e was made aware the above reported symptoms are most probably due to Multiple Sclerosis*."  Upon review of Carter's past electronic medical record documentation, Dr. Patel noted that it indicated "no history of mental health treatment prior to incarceration or upon incarceration" since "his incarceration in 2002," even though by 2007 he had accumulated "55 sexual misconduct tickets."  Dr. Patel concluded that "[b]ased on the history and clinical status [*Carter] meets criteria for diagnosis of Psychotic Disorder with hallucinations and delusions due to Multiple Sclerosis*," and assessed that "*Mr. Carter is in need of mental health treatment on an outpatient basis.*"  (ECF No. 58, PageID.828-29, 835) (emphasis added).

- MDOC's Bureau of Health Care Services record dated April 1, 2011, for treatment of "tactile" and "visual-perc[ep]tual disturbances and/or illusions, and aud[it]ory hallucinations associated with interconnected delusional [] content," during which Carter's mental status exam indicated that "*patient is exhibiting signs of psychosis*"; "Behavior is described as regressive"; "Patient's affect is expansive"; "Patient's mood is anxious and elevated"; "Memory is erratic / inconsistent"; "Patient has poor concentration. Attention is gained and distracted"; "*Reasoning is poor*"; "*Impulse control is poor*"; "*Judgment is poor*"; "*Insight is poor*"; and "*Patient has auditory, tactile, and visual hallucinations*."  He was *diagnosed with a "Mental Disorder Due to General Medical Condition [] (DUE TO MULTIPLE SCLEROSIS)*," a "*Schizoaffective Disorder*," and an "Antisocial Personality Disorder."  The assessment and plan indicated that Carter had a "[c]omplex neuro-psychiatric picture of co-morbid MS with psychiatric manifestations . . . of visual and tactile perceptual disturbances . . . auditory hallucinations .  . . and elicited EPS side effects psychotropic medications." (ECF No. 58, PageID.836-38) (emphasis added).

- Treatment record on June 12, 2012, stating that Carter was treated for

15

"hallucinations and increased sex drive and compulsive masturbation," and notes under "***Rationale for Change in Medications***" that Carter "***[s]till remains with hallucinations and compulsive masturbation with resultant multiple misconducts.*** He targets frequent masturbation as most problematic of his issues. . . . ***Will review chart and see if can target medication for compulsive masturbation.*** Will coordinate with medical service as appropriate re: MS and psychiatric Sx." (ECF No. 58, PageID.843-44) (emphasis added).

- Treatment record dated August 2, 2018, stating that "Carter has been diagnosed with MS; he is currently being monitored by health care. Per records '***This is a complex patient as he has a neuro-muscular disease with some psychiatric manifestations***.'" It notes that Carter "has a history of the following symptoms since being incarcerated: religious and persecutory delusions (food being poisoned), auditory hallucinations, visual hallucinations, obsessions, and tactile perceptual disturbances (often associated with MS), irritability; and anger / behavior discontrol / poor emotional regulation." Carter is noted as "obsessively afraid of germs and wash[ing] his hands 3-4 times an hour," he "believes that he communicates directly with God through aliens," he "received command hallucinations telling him to cut and drink his own blood," he has had "multiple, multiple sexual misconducts (masturbating in front of others)," he "received a one year sentence for exposure to a female staff person," he "has had other misconducts over the past 12 months: multiple threatening behavior, multiple fighting, possession of a weapon, substance abuse, insolence, assault and battery – staff victim to name a few." He was diagnosed with Obsessive Compulsive Disorder, Mood Disorder to Gen Med Cond[ition], Cannabis Abuse, Paraphilia, Isolated Phobias, Psychotic Disorder, Schizotypal Personality Disorder, and Antisocial Personality Disorder. The record states that "[i]n developing a treatment plan for Mr. Carter, his problems with complying with treatment along with reduction in psychotic symptoms will be addressed in case management, psychiatric evaluation, and group therapy." It also states: "STRENGTHS include that ***he admits to needing psychiatric meds***. NEEDS are to ***establish a medication regimen that continue to lessen the impact of his onset of his psychosis***. ABILITIES are that agrees to comply with treatment. PREFRENCES are to ***continue his medication regimen that reduces the impact of his psychosis.***" Finally, under "Relapse Prevention," the record identifies "Symptoms of illness" as "inmate complains of OCD and psychotic symptoms, ***exposure behavior***," and identifies "Early warning signs of possible stressors" as "***increased misconducts***, verbalized changes in mental status." (ECF No. 58, PageID.850-51) (emphasis added).

16

- MDOC's "Monthly Case Management" report dated January 4, 2019, stating that, on June 29, 2018, Carter was voluntarily admitted into the CSP (Crisis Stabilization Program).[9]  Carter "reports sleep issues due to paranoia about 'aliens' . . . [and] reported that the voices were at times troubling in the past and had told him to harm others in the past . . . [but that] the medications are helpful . . ."  Notably, it states that Carter "***has not had any sexual misconducts or any acts of impulsivity since being on the unit***" and "NONE in the past 30 days," despite still reporting "psychotic symptoms occurring a couple times over the past month."  (ECF No. 58, PageID.852-53) (emphasis added).

- Qualified Mental Health Professional ("QMHP") Report from the MDOC dated November 4, 2022, stating under "Clinical History" that Carter has been "diagnosed with serious and chronic mental disorders as follows: Psychosis []; Major Depressive Disorder[,] Recurrent; Obsessive-Compulsive Disorder []; Personality Disorder []."  Notably, under "Conclusion and Recommendations," the report states: "***Mr. Carter has been showing many positive improvements since his addition to my caseload 5 months ago.  His behavior and attitudes [sic] have shown a consistent positive trend over the last few years***.  ***To exemplify, Mr. Carter got 5 tickets in 2019; he got 4 tickets in 2020; 3 tickets in 2021; and for 2022 he has had only 1 ticket, and is currently over 6 months ticket free***.  ***Mr. Carter has worked well with the treatment team, listening to advice and working out some medication issues effectively instead of acting on his initial instincts to have a more contrarian/adversarial response***.  He attends all of his group and individual sessions with rare exception."  (ECF No. 58, PageID.825). (emphasis added).

- Carter's MDOC "Misconduct Summary Report" reflects that, between February 2003 and April 2022, he was charged with more than 350 misconducts and found guilty of more than 340 misconducts, including on numerous charges of "Threatening Behavior," "Disobeying a Direct Order (DDO)," "Sexual Misconduct," "Assault and Battery – Staff Victim," "Insolence," "Sexual Misconduct: Words/Actions of a Sexual Nature," "Sexual Misconduct: Exposure," and "Substance Abuse."  (ECF No. 58, PageID.856-65).

---

[9] "The Crisis Stabilization Program (CSP) services are provided 24 hours/7 days a week for prisoners whose symptoms and behavior demonstrate a mental health crisis with an immediate need for intervention and further evaluation.  The crisis may be an urgent or potentially emergent mental illness and/or a potential high risk of suicide." https://www.michigan.gov/corrections/services/mentalhealth/services/crisis-stabilization-program (last visited February 6, 2024).

Viewed in the light most favorable to Carter, the record contains significant evidence that Carter suffers from disabilities in the form of Multiple Sclerosis and related "serious and chronic mental disorders," which often manifest in behavioral symptoms for which he has been issued misconduct tickets. *See, e.g.*, (ECF No. 58, PageID.851) (noting "Symptoms of illness" as "inmate complains of OCD and psychotic symptoms, exposure behavior," and noting "Early warning signs of possible stressors" as "increased misconducts, verbalized changes in mental status"). The evidence also shows that Carter needed to be treated and given medication to control many of these behavioral symptoms, and that once he was more recently provided with appropriate medication and treatment programs (such as the CSP), and the care of a QMHP, he was able to better control his symptoms and thus began receiving less misconduct tickets, *see e.g.*, the QMHP report reflecting that, after proper medical care, Carter received a total of 13 misconduct tickets between 2019 through 2022 (approx. 3 per year), whereas between 2003 and 2018 he received more than 330 (approx. 20 per year). (ECF No. 58, PageID.825). The evidence also reflects that out of approximately 350 misconduct charges between 2003 and 2022, Carter was found guilty on more than 340 misconducts. This raises material factual questions as to whether Carter was afforded the benefits of the "Special Provisions for Prisoners With A Mental Disability" within the Discipline Policy meant to provide mentally disabled inmates with a process involving a "responsibility determination" by health officials to determine whether the inmate should be held responsible "for his/her

18

behavior due to his/her mental disability"[10] and whether the misconduct report should be processed.  (ECF No. 61, PageID.1169) ("If the prisoner is determined to be not responsible for his[] behavior . . . [or if] the misconduct process would be detrimental to the prisoner's mental health treatment needs . . . the misconduct shall not be processed.").  Defendants have not otherwise directed this Court to evidence showing that a QMHP actually reviewed Carter's misconduct reports and determined that he was "not responsible," or explaining why after examining him it was determined that he should be held "responsible."[11]  Indeed, Defendants' summary judgment motion fails to meaningfully address the above evidence, much less demonstrate that it is undisputed that the issuance of misconduct tickets against Carter and his resultant and continued placement in a maximum facility and segregation were not in violation of the ADA and RA.  As such, Defendants' motion for summary judgment on Carter's ADA and RA claims against Washington in her official capacity for prospective injunctive relief should be denied.

---

[10] P.D. 03.03.105 provides: "'Mental disability' is defined as any of the following:  1. Mental illness, which is a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or the ability to cope with the ordinary demands of life.  2. Severe chronic brain disorder, which is characterized by multiple cognitive defects (e.g., memory impairment resulting from a medical condition . . .) . . ."  (ECF No. 61, PageID.1169).  Defendants have not argued, much less demonstrated through evidence, that Carter does not qualify as having a "mental disability."  But the evidence, viewed in the light most favorable to Carter, indicates that he does suffer from serious "mental disability."

[11] Paragraph III of the "Special Provisions for Prisoners With A Mental Disability" also provides that, even if Carter were "found guilty," "the hearing officer may assign only the sanctions of loss of privileges and/or restitution, as appropriate; if loss of privileges is ordered, the privileges to be withheld shall be determined by the Director of the Corrections Mental Health Program or designee."  (ECF No. 61, PageID.1169-70).  There has been no showing that, of the more than 340 "guilty" findings for Carter, his sanctions were limited to "loss of privileges and/or restitution," let alone that a determination was made by the Director of the Corrections Mental Health Program or designee as to which privileges should be withheld based on Carter's mental health and treatment.

**2.  *§ 1983, ADA, and RA claims against Washington and McKee related to visiting restrictions***

Next at issue are Carter's § 1983 claims against Washington and McKee in their individual capacities for monetary damages, as well as his § 1983, ADA, and RA claims against Washington in her official capacity for prospective injunctive relief.  The Court addresses each in turn.

   i.  <u>Washington and McKee are entitled to qualified immunity on Carter's § 1983 visiting-restrictions claims against them in their individual capacities for monetary damages</u>

As to Carter's visitation restrictions, the record evidence reflects that on September 24, 2010, the Warden of ICF requested a "permanent restriction of all visits for prisoner Carter" because Carter was found guilty of substance abuse in April 2008 and September 2010.  (ECF No. 47-2, PageID.711-12).  "Effectively immediately" on November 1, 2010, the MDOC imposed a visitation restriction to "restrict all visits" except for "attorneys, qualified clergy and staff from the Legislative Corrections Ombudsman's Office" based on Carter's "two recent major misconduct guilty findings [] for Substance Abuse." (*Id.*, PageID.717).  The MDOC directed that the "restriction shall not be considered for removal until at least two years [] and the prisoner has been free of major misconducts for substance abuse or a non-bondable major misconduct during that time period." (*Id.*).

A letter dated October 16, 2018, from Carter to Warden Campbell of the Gus Harrison Correctional Facility ("ARF") states, "I have not seen my mother since 2010.  Can you please recommend that I have my visits back?" (ECF No. 47-2, PageID.720).

On October 22, 2018, Warden Campbell wrote a memo to Deputy Director McKee,

stating that Carter "is seeking reinstatement of his/her visiting privileges" from the visitation restriction that was placed on him on "11/1/2010," but that Carter "has received the following misconduct/s since receiving his/her last six month visit continuation" and "[b]ased on the attached Misconduct Summary Report, I **WOULD NOT** recommend reinstatement of the prisoner's visiting privileges at this time."  (ECF No. 47-2, PageID.719, 722-24) (emphasis in original).

On January 7, 2019, McKee sent a memo to Washington stating, "The Warden is not in favor of restoring [Carter's] visits.  I do not recommend reinstatement of [Carter's] visiting privileges."  (ECF No. 47-2, PageID.725).  Washington then authorized the denial of Carter's request to reinstate visiting privileges, and noted he may "reapply in 6 months." (*Id.*).  The record reflects that Carter has since reapplied for reinstatement of visiting privileges at least two more times, but was denied his requests on May 20, 2020, and February 1, 2022, based on his misconduct history since the continuation of his visiting restrictions.  (ECF No. 61, PageID.1194-97).

In their motion, Defendants argue that "Carter can only claim that the [MDOC] policy is somehow being unfairly applied to him by Defendant Washington and/or McKee" because "the MDOC policy regarding permanent restrictions on visitation, PD 05.03.140, has been ruled constitutional by the U.S. Supreme Court in *Overton v. Bazzetta*, 539 U.S. 126 (2003) [] and the Sixth Circuit in *Bazzetta v. McGinnis*, 430 F.3d 795 (6th Cir. 2005)." (ECF No. 47, PageID.683).

In *Overton*, the Supreme Court held that the MDOC's ban on visitation to inmates committing two major misconduct substance abuse violations did not facially amount to a

cruel and unusual condition of confinement in violation of the Eighth Amendment. *Overton*, 539 U.S. at 130. The Court noted that "[i]f the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations," but "[a]n individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid." *Id.* at 136-37.

In *Bazetta*, the Sixth Circuit addressed the issue of whether the same MDOC visitation ban for two major misconduct substance abuse violations violated the Fourteenth Amendment's Procedural Due Process Clause. *Bazetta*, 430 F.3d at 801. The Sixth Circuit held that "the substance abuse regulation is neither a 'dramatic departure,' nor an 'atypical and significant hardship' in relation to ordinary incidents of prison life," explaining that "although the issue was not directly before the *Overton* Court, [Supreme] Court precedent and dictum has signaled against our finding a liberty interest on the face of the substance abuse regulation." *Id.* at 802-03. While the *Overton* Court "foreclosed a facial procedural due process challenge," the Sixth Circuit noted that *Overton* "does not preclude individual prisoners from challenging a *particular* application of the substance abuse regulation on First Amendment, Eighth Amendment or Fourteenth Amendment grounds . . ." *Id.* at 803 (emphasis in original).

Based on the above, Defendants argue that Washington and McKee are entitled to qualified immunity on Carter's individual-capacity claims against them related to visiting restrictions because it was not clearly established that their application of a constitutional

policy in declining to reinstate Carter's visiting privileges based on his long history of guilty misconduct findings was a violation of constitutional law.   (ECF No. 47, PageID.683-87, 690-92).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether government officials are entitled to qualified immunity, courts must consider: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

As to the second prong, "[f]or a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 368 (6th Cir. 2022) (emphasis in original) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021))).  Put differently, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999).  "The plaintiff bears the burden of showing that the right was clearly established" and, to meet such a burden, "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]." *Bell*, 37 F.4th at 367-68 ("a plaintiff cannot point to unpublished decisions to meet this burden.").

Against these standards, Carter failed to meet his burden to show that it was clearly established that Washington and McKee violated his Eighth or Fourteenth Amendment rights when they relied on his misconduct report summaries and the Wardens' recommendations to decline reinstating Carter's visitation privileges.

Carter has not pointed to any U.S. Supreme Court or published Sixth Circuit opinion that clearly *establishes* that the MDOC's policy on visiting restrictions, as applied to him, violated his Eighth or Fourteenth Amendment rights. While Carter is correct that the Supreme Court in *Overton* acknowledged that "if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates, ***we might*** reach a different conclusion in a challenge to a particular application of the regulation," that only left open the *possibility* of the precedent Carter asks the Court to find. *Overton*, 539 U.S. at 134 (emphasis added). Indeed, the *Overton* Court made clear that "[t]hose issues are not presented in this case." *Id.* Carter's reliance on the Sixth Circuit case of *Bazzetta* is also flawed as that case merely held that while *Overton* did "not preclude individual prisoners from challenging a *particular* application of the substance abuse regulation," the case as presented did not involve an as-applied challenge. *Bazzetta*, 430 F.3d at 803 (emphasis in original). *See also id.* ("[P]laintiffs misconstrue both the nature of the district court's ruling and the difference between a facial and as applied procedural due process challenge. The district court held that the substance abuse regulation, on its face, created a liberty interest . . . [I]t did not make factual findings as to the application of the regulation to any particular prisoner sufficient to support an as applied procedural due process claim."). Thus, neither *Overton* nor *Bazzetta* clearly establish that it was "cruel

24

and unusual" or an "atypical and significant hardship" for a mentally disabled prisoner with two substance abuse violations to have his visiting privileges extended for 6-month periods based on his subsequent and continued history of guilty misconduct findings. *Bell*, 37 F.4th at 367-68 (stating a plaintiff "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]").

Accordingly, Washington and McKee are entitled to qualified immunity on Carter's claims against them in their individual capacities.[12]

> ii. Defendants failed to demonstrate the absence of material factual questions as to Carter's ADA, RA, and § 1983 claims for injunctive relief related to visiting restrictions against Washington in her official capacity

### ADA and RA Claims

Defendants argue that "[t]he record shows that Carter was placed on a visitation restriction based on MDOC policy that has been ruled constitutional by the U.S. Supreme Court," and "[s]ince being placed on this restriction, Carter continues to persistently violate MDOC rules, which had led to over 150 subsequent misconduct convictions," which "have led to the Wardens of the facilities housing Carter to recommend against reinstating Carter's visitation privileges." (ECF No. 47, PageID.686). Defendants argue that "[b]ased on those recommendations and Carter's refusal to comply with MDOC rules, Defendant Washington has continued Carter's visitation restriction." (*Id.*).

---

[12] As discussed below, the analysis is different for Carter's § 1983, ADA, and RA claims based on the visitation ban against Washington in her official capacity for prospective relief. *See Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 417-18 (6th Cir. 2019) ("qualified immunity only immunizes defendants from monetary damages—not injunctive or declaratory relief") (quotation omitted).

In addition to Carter's position that his misconducts are a result of his serious mental disabilities and their symptoms, he responds that the evidence, *see supra* at 20-21, reflects that his visitation ban "is de facto and operates as a permanent ban because [he] has been subject to a[n] arbitrary restriction of his visiting privileges for 13-consecutive years, and [this] violates his rights under the ADA, the RA, and the Eighth and Fourteenth Amendments."  (ECF No. 61, PageID.1140).   Carter also contends that his permanent visitation restrictions "are more severe than the two-year restriction upheld in *Bazzetta*," that "[t]he prisoners in *Bazzetta* did not suffer from serious mental illness," and that, despite being overruled as to a facial challenge, the *Bazzetta* court still made evidentiary findings that "visitation with family is the single most important factor in stabilizing a prisoner's mental health."  (*Id.* at 1141).  He asserts that he "has not seen his loved ones since 2010" due to this ban, and "[n]one of [his] visitors has been accused of misconduct during a visit, nor has [he] ever received a misconduct related to a visit."  (*Id.* at 1142).  He argues that the MDOC has both a "Video Visiting" program and "non-contact visiting booths" as readily available alternatives, but that he is instead "wholly precluded from MDOC visiting programs" even though "[a]ccomodations require special treatment for the disable[d] in situations where facially neutral policies and practices adversely impact the disabled due to their [] mental impairments."  (*Id.* at 1142-43).

Defendants argue in reply that "[t]he restriction was implemented for a valid reason and the restriction has been renewed for valid reasons – [Carter's] unceasing violations of policy, which are often violent or sexual in nature."  (ECF No. 62, PageID.1217).

The Court starts with the most fundamental issue in this case: whether the

misconducts Carter received which led to his continuing visitation ban are a product of his mental illness symptoms for which, under MDOC Policy Directive 03.03.105, he is "not responsible" and should "not be processed."[13] As discussed above, *supra* at 14-19, material factual questions exist as to whether the MDOC issued misconduct tickets for behavioral symptoms of Carter's mental disabilities and found him guilty without reasonably accommodating him with the special provisions for "responsibility determinations" provided to inmates with mental disabilities.  Thus, for that reason alone, viewing the evidence in the light most favorable to Carter, Defendants cannot at this stage rely on misconduct findings that may have been obtained in violation of the ADA and RA as "valid reasons" for renewing his visiting restrictions.[14]

---

[13] The special provisions further reflect that, even if Carter were found "responsible" and "loss of privileges [was] ordered," the "privileges to be withheld shall be determined by the Director of the Corrections Mental Health Program or designee," which Defendants have not demonstrated happened in this case.  (ECF No. 61, PageID.1169-70).

[14] To the extent Defendants argue that Carter "cannot genuinely assert that his numerous sexual misconducts are the result of a disability that is covered by the ADA or RA" because the ADA and RA expressly state that "disability" as statutorily defined does not include "sexual behavior disorders" such as "OCD/Sexual Impulsivity Disorder"  (ECF No. 47, PageID.685), there is medical evidence in the record that certain of his sexual misconducts, such as his numerous guilty findings for "Sexual Misconduct: Exposure," may have been connected to his Multiple Sclerosis diagnosis.  For example, the psychiatric examination in November 2009 reflects that Carter's MS would cause visual and tactile hallucinations during which he sees and feels spiders over his body and causes him to take off his clothes.  (ECF No. 58, PageID.828 (noting "a new charge for indecent exposure" and that it was "unknown if this is related to neurological pathology, but that "at this stage of MS visual hallucinations can occur"); *id.*, PageID.850 (characterizing Carter's MS as a complex "neuro-muscular disease with some psychiatric manifestations" requiring psychiatric medication and noting "Symptoms of illness" as "exposure behavior").  While the Court recognizes the inappropriate sexual nature of Carter's conduct, and the challenges it creates for safely housing him, there is no evidence in the record that Carter's MS is a form of "sexual behavior disorder," which appears to be a medical term of art.  Moreover, Defendants do not address this nuanced issue and related evidence, which, viewed in the light most favorable to Carter, raises material factual questions as to whether certain of Carter's sexual misconducts, such

While Defendants argue that "[w]hat Plaintiff is asking for in relief is that he should be given the *accommodation* of not being held accountable for his misconduct violations," such argument misconstrues Carter's claim. Rather than arguing that he should not be held accountable for any and all misconduct violations, Carter's claim is that he was, and continues to be punished for, behavioral symptoms of his mental disabilities without having been reasonably accommodated by a proper assessment by a qualified mental health professional to determine whether he in fact should be held "responsible" for the conduct at issue in the misconduct report, as is provided for by MDOC policy, and in violation of his rights under the ADA and RA.

In sum, Defendants have failed to meet their burden to demonstrate the absence of a material question of fact as to whether the continuation of Carter's visiting restrictions violates the ADA and RA, and material factual questions remain as to whether such decisions were based on reasons that violated the ADA and RA.

### Section 1983 Official-Capacity Claims

As to Carter's § 1983 official-capacity claims, Defendants argue that "Carter can only claim that the policy is somehow being unfairly applied to him," and that his claims fail because "[a]s admitted by Carter, mental health staff, not Defendant Washington or McKee, have repeatedly determined that his misconduct violations are not the result of a mental disability." (ECF No. 47, PageID.685). Defendants refer to Carter's statement in his verified complaint that "[w]hen a mentally disable[d] prisoner in MDOC is written a

---

as for "Sexual Misconduct: Exposure," were based on behavioral symptoms arising out of a "sexual behavior disorder."

misconduct report, the ticket is sent to a mental health therapist who falsify or rubber stamp the misconduct assessment, stating that the prisoner is responsible for his conduct. Mental health officials who rubber stamped Plaintiff's misconduct assessments, found him responsible each instance of the allege misconduct." (ECF No. 1, PageID.7). But, liberally construed in Carter's favor, and viewed in context of his claims and the record evidence, the Court does not read Carter's statement as an acknowledgment that each of his misconduct tickets were sent to a qualified mental health therapist who then determined, through an appropriate evaluation, that his conduct was not due to his mental disability. Rather, Carter's claim appears to be that he was never actually provided with the proper "responsibility determination" process for mentally disabled prisoners, whether under the applicable Policy Directive or otherwise, and that as a result, he has been subjected to a permanent visitation ban in violation of his Eighth and Fourteenth Amendment rights.[15]

For instance, the MDOC's Comprehensive Psychiatric Evaluation of Carter conducted in November 2009, expressly states that he was diagnosed with MS "since 2000," had "ongoing Exacerbation and remission of neurological symptoms since [20]03," "has not received any mental health treatment since his incarceration in 2002," and assesses for what appears to be the first time in 2009 that "Mr. Carter is in need of mental health

---

[15] To the extent Carter's constitutional claims are based on the alleged violation of an MDOC policy, those claims fail as a matter of law because prison officials are not required to follow their own procedural statutes and rules as a matter of federal due process. *See, e.g., Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005) ("the failure of a prison, or the state, to follow its own policies and procedures does not amount to a constitutional violation."); *Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir.1994) (prison regulations "do not create an independent federal due process liberty interest or right in the prisoner.").

treatment on an outpatient basis." (ECF No. 58, PageID.835). This document suggests that for all of the misconduct tickets he received for the first 7 years of his incarceration between 2002 and 2009, they would not have been reviewed by a qualified mental health professional because he had not received any mental health treatment, even though he was already suffering from MS "since 2000." (ECF No. 58, PageID.829).

Moreover, medical evidence in the record notes "Symptoms of illness" as including "psychotic symptoms, exposure behavior," and "Early warning signs of possible stressors" related to "Relapse" as including "increased misconducts," which suggests that certain behavioral symptoms of Carter's "illness" are at least related to, if not the basis for, certain of his behaviors for which he was issued misconducts. (*Id.*, PageID.851). Some treatment records suggest that his misconducts were directly related to his mental disabilities, as they reflect that once Carter was given the proper mental health medication and treatment, he started receiving fewer misconduct tickets. (*E.g.*, ECF No. 58, PageID.853 (2019 record stating, "Mr. Carter has not had any sexual misconducts or any acts of impulsivity since being on the unit"); (ECF No. 85, PageID.825 (2022 report stating, "Mr. Carter has been showing many positive improvements since his addition to my caseload 5 months ago. . . . To exemplify, Mr. Carter got 5 tickets in 2019; he got 4 tickets in 2020; 3 tickets in 2021; and for 2022 he has had only 1 ticket, and is currently over 6 months ticket free.")). Importantly, Defendants, as the moving party, have not pointed to any actual documentary evidence demonstrating that a qualified mental health professional conducted a "responsibility determination" to find Carter either "responsible" or "not responsible" for conduct underlying any of his misconduct tickets. To the contrary, Carter attests that "[n]ot

one instance during the 330 times [he] received misconducts was he determined 'not responsible' according to MDOC policy, even though the behavior [he] received misconducts for has been specifically diagnosed by MDOC as symptoms of mental illness." (ECF No. 1, PageID.7).

Finally, Carter's case may well fit within the type specifically contemplated by the Supreme Court in *Overton* when it noted that a case involving "withdrawal of all visitation privileges" that was "permanent," "for a much longer period," or "applied in an arbitrary manner to a particular inmate" would "present different considerations." *Overton*, 539 U.S. at 137. Similarly, the Sixth Circuit in *Bazzetta* expressly stated that *Overton* did "not preclude individual prisoners from challenging a *particular* application of the substance abuse regulation on First Amendment, Eighth Amendment or Fourteenth Amendment grounds," and made clear that the holding in *Bazzetta* was "without prejudice to any claim by an individual prisoner that the regulation, as applied to that prisoner, imposes an 'atypical and significant hardship,' thus implicating a protected liberty interest." *Bazzetta*, 430 F.3d at 805.

In this case, the evidence reflects that Carter has been subjected to a restriction of all visitors for over 13 years since 2010, which, at a minimum, is for a "much longer period" than the two-year restrictions addressed by the cases above. Moreover, viewed in the light most favorable to Carter, material factual questions exist as to whether this visitation ban is continuing to be extended based on a misconduct history obtained as a result of a process that violated the ADA and RA. Finally, neither *Overton* nor *Bazzetta* involved a prisoner suffering with mental disabilities such as Carter. While the district court in *Bazzetta* was

31

overruled as to its determination that the substance abuse visitation ban was unconstitutional on its face, the court's finding based on "unrefuted evidence establish[ing] that visitation with family and friends is the single most important factor in stabilizing a prisoner's mental health . . ." was undisturbed. *Bazzetta v. McGinnis*, 148 F. Supp. 2d 813 (E.D. Mich. 2001), aff'd, 286 F.3d 311 (6th Cir. 2002), *rev'd sub nom. Overton v. Bazzetta,* 539 U.S. 126 (2003). The Sixth Circuit has also recognized in the context of assessing whether disciplinary segregation was excessive, that it must be "mindful" of an inmate's "known mental health issues." *J.H. v. Williamson Cnty., Tennessee*, 951 F.3d 709, 718 (6th Cir. 2020); *see also Thompson v. Washington*, No. 1:21-CV-683, 2022 WL 2128264, at **5-6 (W.D. Mich. June 14, 2022) ("[T]he Sixth Circuit recently recognized that segregation more severely affects inmates with existing mental illness.").[16]

Accordingly, for the reasons set forth above, Defendants' motion for summary judgment on Carter's § 1983, ADA, and RA claims against Washington in her official capacity for injunctive relief should be denied.

---

[16] The Court recognizes that "[p]rison administrators [...] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). In response to Carter's requests for admissions, Washington reasons that Carter's "violation of MDOC policy (leading to misconduct tickets) create a security concern that contributes to the denial of reinstatement of [Carter's] visiting privileges." (ECF No. 58-1, PageID.957). However, Defendants cannot show the absence of a material question of fact merely by vaguely referring to possible safety concerns. Indeed, as explained above, material factual questions exist as to whether the continuation of Carter's permanent visitation restriction is based on reasons that violate of the ADA and RA. Moreover, Defendants have not addressed Carter's arguments that video visiting and/or non-contact visits are readily available alternatives that do not implicate security concerns, but that Washington continues to arbitrarily implement a permanent visitation restriction without accounting for his mental disability.

### 3. § 1983, ADA, and RA Claims against MPB Defendants Eagen, King, Warchock, and Flanagan in their Official Capacities for Prospective Injunctive Relief

Finally at issue are Carter's remaining official-capacity claims for prospective injunctive relief under § 1983, the ADA, and the RA against MPB defendants Eagen, King, Warchock, and Flanagan, that accrued on or after February 23, 2018.[17]  Defendants argue that such claims fail because "Carter has no liberty interest in the granting of parole and because parole board members have absolute immunity in their decisions as to both claims for damages and injunctive relief."  (ECF No. 47, PageID.687).

To the extent Defendants argue that the MPB Defendants are entitled to absolute immunity based on their quasi-judicial duties, "a claim for prospective injunctive relief is not barred by the doctrine of judicial immunity."  *Seyka v. Corrigan*, 46 F. App'x 260, 260 (6th Cir. 2002) (citing *Pulliam v. Allen*, 466 U.S. 522 (1984); *see Thompson v. Mich. Parole Bd.*, 2006 WL 3804892, at *1 (E.D. Mich. Dec. 22, 2006) ("[T]he Michigan Parole Board members are entitled to absolute immunity from damages liability for actions taken in the performance of their duties regarding the granting or denying of parole; this derives from their quasi-judicial duties, and a claim for prospective injunctive relief is not barred by the doctrine of judicial immunity.") (citations omitted).  Thus, Defendants are not entitled to summary judgment on the basis of immunity as to Carter's claims for prospective injunctive relief.

On the merits, as best as can be discerned, Carter's § 1983, ADA, and RA claims

---

[17] As discussed above, a claim against a MPB defendant in his official capacity is akin to a claim against the MPB.  *See Foster*, 573 F. App'x at 390.

allege violations primarily based on the MPB's continued use of "false and inaccurate information . . . to deny [him] parole," and its failure to provide him with "D-42" and "D-47" referrals.  First, Carter argues that the MPB Defendants continue to consider his alleged "sham misconduct" reports that punish him for symptoms of mental disability to deny him parole.  However, the Sixth Circuit has explained that "Michigan law, which imbues the Parole Board with broad discretion, does not create a liberty interest in the granting of parole," and "[t]herefore, even if the Parole Board relied on inaccurate information to deny [inmate's] parole, it did not violate any liberty interest protected by the United States Constitution."  *Caldwell v. McNutt*, 158 F. App'x 739, 740-41 (6th Cir. 2006).  Similarly, "[t]he ADA does not categorically bar a state parole board from considering an inmate's disability in making an individualized assessment of the future dangerousness of the inmate . . . [W]ithout question, the parole board has a legitimate penological interest in considering a prisoner's [] offender history during an individualized inquiry for parole suitability." *Carter v. Michigan Dep't of Corr.*, No. 1:13-CV-37, 2013 WL 3270909, at *7 (W.D. Mich. June 27, 2013); *see also Thompson v. Davis*, 295 F.3d 890, 898 n.4 (9th Cir. 2002) ("A person's disability that leads one to a propensity to commit crime may certainly be relevant in assessing whether that individual is qualified for parole . . .  The parole board claims to have and undeniably does have legitimate penological interests in considering the plaintiffs' substance abuse backgrounds during the individualized inquiry for parole suitability.").  Thus, Carter's § 1983, ADA, and RA claims based on the use of inaccurate information in making his parole decisions fail as a matter of law.

Second, Carter argues that he qualifies for a "D-42" psychological evaluation and a

"D-47" mental health parole program, but that Defendants continue to deny him

meaningful access to these programs and services.  A D-42 is:

> . . . the Parole Board Action (Deferred- Code 42) for an offender who
> is being considered for parole, but the decision is deferred for the Parole
> Board to obtain additional information regarding the offender.  D42
> actions are taken pursuant to the discretionary judgment and needs of
> the Parole Board member(s).

(ECF No. 47-4, PageID.751).  MPB defendant King avers that a prisoner "does not obtain

a D-42," but that a D-42 is a "referral or request for additional information" that is done by

the MPB "pursuant to the needs and discretion of the Parole Board member"   (ECF No.

47-5, PageID.755-56).  Moreover, he avers Carter was not referred for a D-42 because "a

D-42 was not necessary" for the MPB to make its parole decision.  (*Id.*, PageID.756).

A D-47 is:

> . . . the Parole Board action (Deferred – Code 47) for an offender with
> mental illness who is being considered for parole, but the decision is
> deferred pending further review.  Offenders in this category have
> mental health needs that may require specialized community-based
> aftercare plans for parole release.  D47 actions are taken pursuant to the
> discretionary judgment of the Parole Board member(s) and are not taken
> on offenders that the Parole Board does not deem otherwise ready for
> parole.  Pursuant to a D47 vote, a referral is made to an MDOC
> contractor to develop a plan for community-based services.  Once this
> plan is developed, the deferred case is sent back to the Parole Board for
> voting.

(ECF No. 47-4, PageID.751).  Defendant King avers that a D-47 is used "when a parole

decision is deferred to obtain a comprehensive community-based support plan for a

prisoner the Parole Board is interested in paroling," and as such, these "requests are made

at the discretion of the Parole Board."  (ECF No. 47-5, PageID.756).  He further avers that

the MPB did not refer Carter for a D-47 because "a D-47 was not needed as Plaintiff was

not suitable for parole." (*Id.*).

Even viewing the above evidence in the light most favorable to Carter, the record does not raise material factual questions as to whether the MPB's decision not to refer Carter for a D-42 or a D-47 violated his constitutional rights or the ADA/RA. As an initial matter, the evidence makes clear that a D-42 and D-47 are discretionary actions available *to the MPB* if it decides that it requires more information about a prisoner before making a parole decision; it is neither a program nor accommodation provided *for an inmate's use*. (*See also* ECF No. 58-2, PageID.1060 (a D-42 or D-47 is not an "accommodation for mentally ill prisoners")). Moreover, the undisputed evidence shows that a D-42 or D-47 request is not precluded by "sham" misconduct tickets, as the MPB can and has requested such referrals for "prisoners who have received misconduct tickets," and "prisoners do not have to be misconduct free for a specific time period before a Parole Board member can vote a D-42 or D-47 referral." (*Id.*, PageID.1060).

As for a D-42 specifically, Defendants presented evidence that the MPB did not refer Carter for a D-42 because it was "not necessary" for them to obtain more information on him. To the extent Carter argues that a psychological evaluation was needed for the MPB to make an informed parole decision, it is not for Carter to dictate what "additional information" the MPB requires given its "broad discretion" in making such a decision. In any case, the evidence reflects that the MPB considered Carter's "multiple diagnosed conditions, including mental illnesses" (ECF No. 58-2, PageID.1068), "did review and consider [his] mental health information when making [the] parole decision" (*id.*, PageID.1061), and considered interviews by Carter's treating health professionals

36

concerning his mental health and behavior (ECF No. 58-1, PageID.1002, 1008 ("Dr. Webster said P has made a significant change in direction, P wants to be in treatment . . . P has clearly made a personal effort to adjust better in prison"); ECF No. 61, PageID.1149-50 (stating MDOC mental health staff "submitted an evaluation to the MPB of Plaintiff's positive behavior")). Even assuming that under MPB guidelines the MPB still should have ordered an additional psychological evaluation, "a failure to follow its own policy directives during the parole hearing . . . [does] not violate any liberty interest protected by the due process clause of the United States Constitution," and thus cannot be the basis for a valid claim. *Thompson v. Michigan Parole Bd.*, 2006 WL 3804892, at *2 (E.D. Mich. Dec. 22, 2006) (citing *Moran v. McGinnis*, 1996 WL 304344, *2 (6th Cir. 1996)).

As for a D-47, Defendants present evidence that the MPB deemed Carter "not suitable for parole," and therefore it was not yet necessary to develop "specialized community-based aftercare plans for parole release." (ECF No. 58-2, PageID.1055, 1059). Carter acknowledges in his response that the MPB specifically contemplated in November 2022 that he "[w]ill need D47 *eventually*" – *i.e.*, when the MPB deems him "ready for parole" – "but C-12 (or continuation 12 months) as [Carter] has yet to complete MSAPP which he needs to reduce risk" before he may be deemed suitable for parole. (ECF No. 58-2, PageID.1046). Moreover, Carter appears to be mistaken in his belief that the MPB can order that he be provided with mental health or community-based programs, as the MPB is "only a release authorizing unit and can set conditions of parole" but does not otherwise "have mental health programs" or "run community-based programs." (ECF No. 58-2, PageID.1069). In short, Carter cannot sustain his claims that the MPB unlawfully

denied him meaningful access to a community-based aftercare program developed for those who are ready to be released on parole when the evidence makes clear that the MPB, after thorough consideration of the evidence before it, did not deem him ready for parole.

Accordingly, Carter's § 1983, ADA, and RA claims against the MPB defendants in their official capacity fail as a matter of law, and summary judgment should be granted in their favor on these claims.

## III.    CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 47)** be **GRANTED IN PART AND DENIED IN PART** as follows:

- Defendants' request for summary judgment as to Carter's ADA and RA claims for prospective injunctive relief related to his misconduct tickets and placement in segregation/maximum facility against Washington in her official capacity should be **DENIED**;

- Defendants' request for summary judgment as to Carter's § 1983 claims for monetary damages related to his visitation ban against Washington and McKee in their individual capacities should be **GRANTED**;

- Defendants' request for summary judgment as to Carter's § 1983, ADA, and RA claims for injunctive relief related to his visitation ban against Washington in her official capacity should be **DENIED**; and

- Defendants' request for summary judgment as to Carter's § 1983, ADA, and RA claims for prospective injunctive relief against the MPB defendants in their official capacities should be **GRANTED**.

Dated: February 13, 2024                         s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

38

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 13, 2024.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager