UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL CARTER,

      Plaintiff,

                                    Case No. 21-cv-10518

v.                                   Hon. Matthew F. Leitman

HEIDI WASHINGTON, *et al*.,

      Defendant.

_____/

## ORDER (1) OVERRULING DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATION (ECF No. 64), (2) SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION (ECF No. 65); (3) ADOPTING IN PART RECOMMENDED DISPOSITION OF REPORT AND RECOMMENDATION (ECF No. 63), AND (4) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 47)

The allegations in this prisoner civil-rights case are troubling. Plaintiff Joel Carter is an inmate in the custody of the Michigan Department of Corrections (the "MDOC"). He has been diagnosed with several serious mental illnesses, including Psychosis Disorder Due to Multiple Sclerosis, Obsessive Compulsive Disorder, and Paraphilia Disorder (sexual impulsivity). His documented symptoms include paranoia, hallucinations, mania, delusions, anxiety, depression, and thoughts of suicide. He claims that as a result of these mental illnesses, he is unable to conform his behavior to certain MDOC rules and regulations. And he says that he has

received hundreds of disciplinary misconduct tickets as a result of his involuntary infractions.  He asserts that these tickets, in turn, have led to severe restrictions on his visitation privileges – he says has not been permitted a visit with family or friends since 2010 – and have caused him to spend 6 years housed in restrictive segregation units, where he is in solitary confinement 23 hours a day.  Finally, he claims that he has been eligible for parole since March 2013 and that his parole has been repeatedly denied based upon the misconduct tickets that he has received as a result of his mental illnesses.  In short, Carter alleges that Defendants have wrongfully punished him, isolated him, and kept him incarcerated based upon his mental illness.

On February 23, 2021, Carter, proceeding *pro se*, filed this action against employees of the MDOC and the Michigan Parole Board (the "MPB").  Carter alleges violations of (1) Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132; (2) Section 504 of the Rehabilitation Act (the "RA"), 29 U.S.C. § 794; and (3) the Eighth and Fourteenth Amendments.  Some of Carter's claims were dismissed upon the initial screening of this action by the previously-assigned district judge. (*See* Order, ECF No. 8.)  The following claims remain before the Court:

- A claim against Defendant Heidi Washington, Director of the MDOC, in her official capacity, for violation of the ADA and RA (the "RA/ADA Injunction Claim").  This claim alleges that Washington has adopted an

unlawful policy and practice of punishing mentally-disabled prisoners for behaviors and/or symptoms of their mental illnesses.  As relief, Carter seeks an injunction prohibiting Washington from enforcing this policy and engaging in this practice.

- A claim for money damages under 42 U.S.C. § 1983 ("Section 1983") against Washington and Kenneth McKee, Deputy Director of the MDOC, in their individual capacities, based upon the restriction and/or effective elimination of Carter's visitation privileges (the "Visitation Damages Claim").

- A claim against Washington under Section 1983, the RA, and the ADA, in her official capacity, for injunctive relief prohibiting the restriction of Carter's visitation privileges (the "Visitation Injunction Claim").

- A claim for injunctive relief against several of the MPB's current or former members (Defendants Michael Eagan, Anthony King, Sonia Warchock, and Timothy Flanagan – the "MPB Defendants"), in their official capacities, alleging violations of the ADA, the RA, and the Eighth Amendment based upon, among other things, their alleged consideration of the improperly-issued disciplinary infractions in denying Carter parole and their alleged refusal to make available to Carter certain mental health

evaluations and pre-release planning programs (the "Parole Injunction Claim").

Now before the Court is a Motion for Summary Judgment by the remaining Defendants on these remaining claims. (*See* Mot., ECF No. 47.)   On February 13, 2024, the assigned Magistrate Judge issued a report and recommendation in which he recommended that the Motion be granted in part and denied in part (the "R&R"). (*See* R&R, ECF No. 63.)   More specifically, the Magistrate Judge recommended that the Court grant the motion with respect to the Visitation Damages Claim and the Parole Injunction Claim (and dismiss those claims from the action) and that the Court deny the motion with respect to the RA/ADA Injunction Claim and the Visitation Injunction Claim (and permit those claims to proceed).

All parties have filed objections to the R&R. (*See* Objections, ECF Nos. 64, 65.)   For the reasons explained below, Defendants' objections are **OVERRULED**, Carter's objections are **SUSTAINED IN PART AND OVERRULED IN PART**, and Defendants' motion is **GRANTED IN PART AND DENIED IN PART** as set forth below.

# I

When a party objects to portions of a Magistrate Judge's report and recommendation, the Court reviews those portions *de novo*. *See* Fed. R. Civ. P. 72(b)(3); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 661 (E.D. Mich. 2004).

The Court has no duty to conduct an independent review of the portions of a report and recommendation to which the parties did not object. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F.Supp.2d 743, 747 (E.D. Mich. 2004). Moreover, "[t]he filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object." *Zimmerman v. Cason*, 354 F. App'x 228, 230 (6th Cir. 2009).

## II

The Defendants raise only one objection to the R&R. That objection relates to the Magistrate Judge's recommendation that the Court deny summary judgment with respect to the RA/ADA Injunction Claim. The Court outlines the claim, the proceedings related to the claim, and Defendants' objection below.

## A

The R&R contains a helpful summary of the RA/ADA Injunction Claim. For ease of reference, the Court restates that summary below:

> First at issue are Carter's ADA and RA claims against MDOC Director Washington in her official capacity for prospective injunctive relief related to his continued receipt of misconduct reports and placement in a maximum-security facility and segregation. In this regard,

Carter makes the following relevant allegations in his verified complaint:

> Plaintiff suffers from Multiple Sclerosis ("MS"), a neurological condition that results in multiple and varied neurologic symptoms.  As a result of multiple sclerosis, Plaintiff has been diagnosed by MDOC mental health officials with a variety of mental impairments, including "Psychosis Disorder Due to Multiple Sclerosis," a "Mental Disorder Due to Medical Condition," an "Obsessive Compulsive Disorder" ("OCD"), and a "Paraphilia Disorder" (Sexual Impulsivity).   Plaintiff's documented symptoms include paranoia, hallucinations, mania, delusions, anxiety, depression, and thoughts of suicide.
>
> [] Plaintiff's mental disabilities result in compulsions, impulses, an inability to concentrate, make decisions, sleep, and uncontrollable crying. Plaintiff is on medication for his mental disabilities and is prescribed Risperidal for his psychosis, and Prozac for his sexual impulses.
>
> * * * * *
>
> Defendant[] Washington [] has an illegal practice of punishing mentally disable[d] prisoners for behavior or symptoms known to be related to mental illness, despite the prohibition on such punishment set forth in MDOC Policy Directive 03.03.105, paragraph DDD through JJJ, "Special Provisions For Prisoners With A Mental Disability," . . . [which] states in part:
>
>> A prisoner with a mental disability is not responsible for misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of mental disability. Mental

6

disability is defined as any of the following[]
. . . [including] 1. Mental illness, which is
substantial disorder of thought or mood
which significantly impairs judgment,
behavior, capacity to recognize reality, or the
ability to cope with the ordinary demands of
life.

. . Plaintiff has a condition which meet[s] the
definition of mental disability under MDOC policy
"Special Provisions For Prisoners With A Mental
Disability," but Washington [] continue[s] to
exclude Plaintiff from enjoying the benefits of these
services as a matter of policy because all mentally
disable[d] prisoners housed with the MDOC are
excluded from these services and are subject to
intentional discrimination.

. . . MDOC officials [continue] to issue mentally
disable[d] prisoners misconduct reports as pretext to
discriminate against [sic] by virtue of their mental
disabilities. MDOC officials are not trained on how
to handle mentally disable[d] prisoners. . . . As a
result, MDOC officials have issued Plaintiff over
330 misconduct reports as a result of mental illness.
Not one instance during the 330 times Plaintiff
received misconducts was he determined " not
responsible" according to MDOC policy, even
though the behavior Plaintiff received misconducts
for has been specifically diagnosed by MDOC as
symptoms of mental illness.

[] When a mentally disable[d] prisoner in MDOC is
written a misconduct report, the ticket is sent to a
mental health therapist who falsif[ies] or rubber
stamp[s] the misconduct assessment, stating that the
prisoner is responsible for his conduct. Mental
health officials who rubber stamped Plaintiff's
misconduct assessments, found him responsible
each instance of the alleged misconduct. . . . []

MDOC mental health officials ha[ve] an unlawful practice of conducting these sham misconduct assessments without any meeting or evaluation of a prisoner's mental state prior to the responsib[ility] determination. Mental health officials conducting responsibility determinations refuse to evaluate mentally disable[d] prisoners at or near the time of occurrence, resulting in unnecessary disciplinary action, contrary to MDOC policy.

[] Plaintiff has and continues to be sanctioned for symptoms of mental illness, by being subject to disciplinary and administrative segregation, and indefinitely placed in a Level 5 maximum facility. Plaintiff has spent over 6-years in segregation, even though MDOC mental health officials have determined that "segregation is problematic to [Plaintiff's] mental health." Plaintiff has spent 10-years in a maximum security facility as a result of this practice.

* * * * *

Each instan[ce] Plaintiff is found guilty of misconduct, he is issued points. For 15-years Plaintiff has been classified for the maximum amount of misconduct points a prisoner can incur (thirty-five points). Most mentally disable[d] prisoners within the MDOC ha[ve] 35-points. These points adversely impact disciplinary decisions, and has caused Defendants to house Plaintiff in their highest security level, a Level 5 maximum facility and has actually affected Plaintiff's parole eligibility.

[] According to MDOC Policy Directive 05.01.130, "Prisoner Security Classification," a prisoner who has 23 through 35 points can be housed in a Level 5 facility. In order to be confined in a Level IV medium security facility, a prisoner must have 15

through 22 points.  A prisoner must have 7-14 points for placement in a Level II, and 0-6 to be housed in a Level I.  In order for a prisoner to reduce their points they must remain misconduct free for 6-months.  Every 6-months misconduct free Defendants deduct 6 points.  If a prisoner has 35 points, he must go approximately a year and a half without a prisoners, such as Plaintiff[,] cannot remain misconduct free in order to reduce their points for transfer to a lower security level, which result in mentally disable[d] prisoners remaining in maximum facility.

[] Mentally disable[d] prisoners who ha[ve] or will experience bad days, weeks or months result in misconducts and multi-year stints or indefinite placement in maximum facility.  These clustered sanctions punish mentally-ill prisoners for extended misbehavior much more harshly th[a]n non-disable[d] prisoners who can demonstrate positive behavior for prolonged periods. . . .

[] In Level 5, Plaintiff is subject to social isolation, sensory deprivation, and reduced environmental stimulation that approach the limits of human endurance.  Plaintiff is entombed in a concrete cell 23 hours a day, seven days a week.  Plaintiff is allowed limited congregate activities and very few privileges.  Visiting is non contact and is severely restricted. . . . For 7-years Defendants have denied Plaintiff physical contact with his family members [since 2011 for two substance abuse misconduct violations].  Defendants continue to do this pursuant to a policy that has a disparate impact on him. misconduct for a reduction of his security level.  This policy has a disparate impact on mentally disable[d] prisoners.  This is because the vast majority of mentally ill prisoners, such as Plaintiff[,] cannot remain misconduct free in order to reduce their points for transfer to a lower security

level, which result in mentally disable[d] prisoners remaining in maximum facility.

(ECF No. 1, PageID.4-10)

As best as can be discerned, Carter alleges that, since his incarceration in 2002, he has been issued misconduct tickets for certain behaviors that are the symptoms of his mental disabilities stemming from MS, in violation of the ADA and RA. He claims that this practice has led to him being assigned the maximum number of misconduct points – 35 – which are then used to impose a sanction of segregation and classify him for Level V placement at a maximum-security facility, where he is kept in his cell for 23 hours a day, and is allowed only limited congregate activities and very few privileges. Moreover, he claims that the MDOC requires that inmates be "misconduct free" for six months before it will deduct 6 misconduct points from his total misconduct points, but that this fails to accommodate him as a mentally disabled inmate because his mental disabilities often manifest in behavioral symptoms for which he is wrongly being issued misconduct tickets. Carter contends that this effectively makes it impossible for him to receive a deduction in misconduct points unless he is able to suppress the symptoms of his mental disabilities for six months at a time. Finally, he claims that MDOC Policy Directive 03.03.105, entitled "Prisoner Discipline," specifically contemplates "special provisions" or "accommodations" for the discipline of "prisoners with a mental disability,"6 but that, in practice, he has not been afforded the benefit of such an accommodation because not once has he been found "not responsible" for a misconduct ticket that was based on behavior specifically diagnosed by the MDOC as symptoms of mental illness.

Based on the above alleged ADA and RA violations, Carter "seeks injunctive relief ordering Defendants, charged with implementing and enforcing MDOC services and programs[,] to provide [him] benefits to which he is

entitled, and to expunge all misconduct guilty findings for violations of MDOC policy, as well as, state and Federal Laws," and to "[p]ermanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting [him] to the conditions described in this Complaint." (ECF No. 1, PageID.2, 22).

(R&R, ECF No. 63, PageID.1224-1228.)

### B

In their Motion for Summary Judgment, Defendants argued that the RA/ADA Injunction Claim "against Washington fail[ed] as Carter cannot show that Washington was personally involved in issuing misconduct reports or of finding Carter guilty of misconduct violations, which Carter asserts led him to being placed in maximum facilities and/or segregation." (Mot., ECF No. 47, PageID.680.)  They stressed that "Director Washington has no involvement in issuing misconduct reports to prisoners, in conducting hearings or appeals on those misconducts, or in issuing disciplinary sanctions to prisoners.  Those actions are all done by other individuals." (*Id*., PageID.681.)  And they added that "the resulting facilities and security levels at which Carter is housed is not based on actions of Defendant Washington." (*Id*.)  Simply put, Defendants primarily argued that the RA/ADA Injunction Claim "fail[ed] because vicarious liability does not apply to claims brought under Title II of the ADA and the Rehabilitation Act." (*Id*., PageID.680.)

Defendants also argued that to the extent Carter alleges that Washington is liable under a failure to train theory, Washington could not be held liable based on

11

that theory because she was not personally involved in, and did not perform supervision over, the specific acts and omissions underlying the claim. (*See id.*) Finally, Defendants contended that Carter's failure to train/supervise allegations were "wholly conclusory." (*Id.*, PageID.682.)

## C

The Magistrate Judge recommended denying the Motion for Summary Judgment on the RA/ADA Injunction Claim. He first noted that Defendants' motion did "not address the merits of Carter's ADA and RA claims. Instead, Defendants argue[d] only that 'Carter's ADA and RA claims [] fail as Carter cannot show that Washington was personally involved in issuing the misconduct reports or of finding Carer guilty of misconduct violations.'" (R&R, ECF No. 63, PageID.1229, quoting Mot. for Summ. J., ECF No. 47, PageID.680.)

The Magistrate Judge then rejected Defendants' argument that the RA/ADA Injunction Claim failed due to a lack of personal involvement by Washington. He agreed with Carter that because "Washington [was] sued in her official capacity" in the RA/ADA Injunction Claim, the claim was, "'for all intents and purposes, against the State of Michigan as the real party-in-interest." (*Id.*, PageID.1230, quoting Carter's Resp. to Mot., ECF 61, PageID.1139-1140.) It therefore did not "require a showing of personal involvement by Washington." (*Id.*) He finally concluded that

12

Carter may seek "prospective injunctive relief" against Washington, in her official capacity, for violations of the RA and the ADA. (*Id*.)

After he rejected the Defendants' lack-of-personal involvement argument, the Magistrate Judge then made the following additional observations about Defendants' failure to attack the merits of the RA/ADA Injunction Claim:

> On the merits, Defendants, as the party moving for summary judgment, fail to meaningfully address Carter's ADA and RA claims related to misconduct tickets and placement in a maximum-security facility and segregation. Indeed, Defendants have not argued that Carter has failed to state viable ADA and RA claims in this regard, or to raise a material question of fact. Moreover, most of the record evidence on these claims was neither presented nor meaningfully addressed by Defendants. This alone is a sufficient basis to deny Defendants' motion for summary judgment on these claims.

(*Id*., PageID.1233.)

Even though the Defendants did not attack the merits of the RA/ADA Injunction Claim, the Magistrate Judge nonetheless went on to discuss the merits of the claim at some length. (*See id*., PageID.1233-1238.) In that discussion, the Magistrate Judge highlighted evidence supporting the claim, including evidence dating back to 2009. (*See id*.)

## D

Defendants' objection to the Magistrate Judge's analysis of the RA/ADA Injunction Claim is a narrow one. The Defendants do not take issue with Magistrate

Judge's conclusion that the claim may proceed against Washington, in her official capacity.  Nor do they take issue with the Magistrate Judge's observation that they failed to meaningfully challenge the merits of the claim.  Instead, they object to the manner in which the Magistrate Judge described the claim when he discussed the merits of the claim.  They assert that he wrongly described the claim as arising out of, among other things, acts and omissions that occurred outside of the limitations period.  In their words, the Magistrate Judge "improperly created and then considered claims barred by the statute of limitations." (Defendants' Objections, ECF No. 64, PageID.1262.)  More specifically, they argue that Carter received only "17 [disciplinary] misconduct guilty findings" within the limitations period, but the Magistrate Judge considered more than 350 misconducts, the vast majority of which fell outside of the limitations period. (*Id*., PageID.1266.)  Defendants ask the Court to "reject the [Magistrate Judge's] analysis and recommendations" with respect to the RA/ADA Injunction Claim and to permit them "to file an additional brief related to the 17 misconducts that make up the claims that are not barred by the statute of limitations." (*Id.*, PageID.1267.)

## E

Defendants' objection is **OVERRULED**.  Defendants are not entitled to relief based on the objection because, as noted above, it does not address the reasoning or analysis underlying the Magistrate Judge's recommended disposition of the

RA/ADA Injunction Claim.  Thus, the objection does not show that the basis of the Magistrate Judge's recommendation was wrong.

To the extent that Defendants have a concern about the manner in which the Magistrate Judge described the RA/ADA Injunction Claim, they may present that concern in a motion *in limine* that seeks to confine the trial evidence to what Defendants believe to be the true parameters of the claim.

Finally, the Court rejects Defendants' request to file an additional brief at this time addressing the merits of the 17 misconduct findings that, according to Defendants, occurred within the limitations period.  Defendants contend that they believed, going into the summary judgment briefing, that those 17 findings were the only ones at issue in this action (*see* Defendants' Objections, ECF No. 64, PageID.1260-1265), yet they did not address those findings in their Motion for Summary Judgment.  That was the time do so.  The Court is not willing to give Defendants a second bite at the apple at this time.[1]

### III

The Court now turns to Carter's objections.  His objections relate to the Magistrate Judge's recommendations with respect to the Visitation Damages Claim

---

[1] However, as set forth below, the Court is willing to permit Defendants to file another motion for summary judgment at a later time, after (among other things) counsel is appointed for Carter.

and the Parole Injunction Claim.  The Court outlines those claims, the proceedings related to the claims, and Carter's objections below.

## A

The Court begins with the Visitation Damages Claim.  As noted above, Carter brings this claim against Washington and McKee in their individual capacities, and he seeks damages against them.  The claim is based upon Carter's allegation that his visitation privileges have been suspended and/or revoked for unduly long periods of time.

The Magistrate Judge concluded that Washington and McKee were entitled to qualified immunity from this claim.  He said that Carter "ha[d] not pointed to any U.S. Supreme Court or published Sixth Circuit opinion that clearly establishe[d] that the MDOC's policy on visiting restrictions, as applied to him, violated his Eighth or Fourteenth Amendment rights." (R&R, ECF No. 63, PageID.1243.)   He further noted that Carter relied on two decisions – *Overton v. Bazzetta*, 539 U.S. 126 (2003) and *Bazetta v. McGinnis*, 430 F.3d 795 (6th Cir. 2005) – and he explained why those decisions did not clearly establish that the manner in which the MDOC applied its visitation policy to him violated the Eighth Amendment. (*See id*.)  The Magistrate Judge's analysis was as follows:

> Carter has not pointed to any U.S. Supreme Court or published Sixth Circuit opinion that clearly establishes that the MDOC's policy on visiting restrictions, as applied to him, violated his Eighth or Fourteenth Amendment

rights.  While Carter is correct that the Supreme Court in *Overton* acknowledged that "if faced with evidence that MDOC's regulation is treated as a de facto permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation," that only left open the possibility of the precedent Carter asks the Court to find. *Overton*, 539 U.S. at 134 (emphasis added).  Indeed, the *Overton* Court made clear that "[t]hose issues are not presented in this case."  *Id.*  Carter's reliance on the Sixth Circuit case of *Bazzetta* is also flawed as that case merely held that while *Overton* did "not preclude individual prisoners from challenging a particular application of the substance abuse regulation," the case as presented did not involve an as-applied challenge. *Bazzetta*, 430 F.3d at 803 (emphasis in original).  *See also id*. ("[P]laintiffs misconstrue both the nature of the district court's ruling and the difference between a facial and as applied procedural due process challenge.  The district court held that the substance abuse regulation, on its face, created a liberty interest . . . [I]t did not make factual findings as to the application of the regulation to any particular prisoner sufficient to support an as applied procedural due process claim.").  Thus, neither *Overton* nor *Bazzetta* clearly establish that it was "cruel and unusual" or an "atypical and significant hardship" for a mentally disabled prisoner with two substance abuse violations to have his visiting privileges extended for 6-month periods based on his subsequent and continued history of guilty misconduct findings. *Bell*, 37 F.4th at 367-68 (stating a plaintiff "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]").

(*Id.*, PageID.1243-1244.)

In his objections to the R&R, Carter contends that the Magistrate Judge misread *Overton* and *Bazetta*.  He argues as follows:

> The Supreme Court in *Overton* established in 2003, that "if the withdrawal of all visitation privileges were permanent or for a much longer period, or "applied in an arbitrary manner to a particular inmate, the case would present different considerations." *Overton v. Bazzetta*, 539 U.S. 126 (2003). Further, the Sixth Circuit held in 2005 that *Overton* "does not preclude individual prisoners from challenging a particular application of the substance abuse regulation on First Amendment, Eighth Amendment, or Fourteenth Amendment grounds." *Bazzetta v. McGinnis*, 430 F.3rd 795 (6th Cir. 2005).
>
> Plaintiff argues that he demonstrated that his visiting ban is both "permanent" and "applied in an arbitrary manner," and both the Supreme Court's ruling in *Overton* and the Sixth Circuit's holding in *Bazzetta* point unmistakably to the unconstitutionality of the conduct complained of and clearly foreshadowed by applicable authority as to leave no doubt in the mind of a reasonable officer that their conduct, if challenged on constitutional grounds, would be found wanting.

(Carter's Objections, ECF No. 65, PageID.1271.)

The Court **OVERRULES** this objection. The excerpts from *Overton* and *Bazetta* quoted by Carter confirm, rather than undermine, the correctness of the Magistrate Judge's conclusion and analysis. While both excerpts suggest that the conduct alleged by Carter *could* rise to the level of an Eighth Amendment violation, neither decision so *holds*. Thus, the Magistrate Judge properly determined that the Visitation Damages Claim is barred by qualified immunity. Carter's objection related to the Visitation Damages Claim is therefore **OVERRULED**.

**B**

The Court now turns to the Parole Injunction Claim.  Carter brings this claim against the MPB Defendants.

**1**

As the Magistrate Judge explained, the Parole Injunction Claims appears to challenge three acts and/or omissions by the MPB Defendants.  First, Carter alleges that they improperly denied his parole based upon disciplinary infractions that were caused by his mental disability.  Second, Carter alleges that the MPB Defendants denied him meaningful access to a "D-42" psychological evaluation.  A D-42 is a psychological examination that is sometimes conducted when the MPB is considering an inmate for parole. (*See* ECF No. 47-4, PageID.751.)  Third, Carter says that the MPB Defendants wrongly refused to refer him for "D-47" planning.  The D-47 program involves referring an inmate who is being considered for parole to an MDOC contractor so that the contractor can develop a plan for community-based services that would be provided if the inmate is granted parole. (*See* ECF No. 47-4, PageID.751.)

**2**

The Magistrate Judge concluded that the MPB Defendants were entitled to summary judgment on the Parole Injunction Claim.  First, he said that even if the MPB was relying on inaccurate disciplinary findings to deny parole, that would not

rise to the level of a constitution violation. (*See* R&R, ECF No. 63, PageID.1253.)

He explained the reasoning for that conclusion as follows:

> However, the Sixth Circuit has explained that "Michigan law, which imbues the Parole Board with broad discretion, does not create a liberty interest in the granting of parole," and "[t]herefore, even if the Parole Board relied on inaccurate information to deny [inmate's] parole, it did not violate any liberty interest protected by the United States Constitution." *Caldwell v. McNutt*, 158 F. App'x 739, 740-41 (6th Cir. 2006). Similarly, "[t]he ADA does not categorically bar a state parole board from considering an inmate's disability in making an individualized assessment of the future dangerousness of the inmate . . . [W]ithout question, the parole board has a legitimate penological interest in considering a prisoner's [] offender history during an individualized inquiry for parole suitability." *Carter v. Michigan Dep't of Corr.*, No. 1:13-CV-37, 2013 WL 3270909, at *7 (W.D. Mich. June 27, 2013); *see also Thompson v. Davis*, 295 F.3d 890, 898 n.4 (9th Cir. 2002) ("A person's disability that leads one to a propensity to commit crime may certainly be relevant in assessing whether that individual is qualified for parole . . . The parole board claims to have and undeniably does have legitimate penological interests in considering the plaintiffs' substance abuse backgrounds during the individualized inquiry for parole suitability."). Thus, Carter's § 1983, ADA, and RA claims based on the use of inaccurate information in making his parole decisions fail as a matter of law.

(*Id.*)

The Magistrate Judge next concluded that the Parole Injunction Claim failed to the extent that it is based upon the MPB Defendants' alleged refusal to refer Carter for a D-42 evaluation and/or for D-47 planning. His analysis was as follows:

Even viewing the above evidence in the light most favorable to Carter, the record does not raise material factual questions as to whether the MPB's decision not to refer Carter for a D-42 or a D-47 violated his constitutional rights or the ADA/RA. As an initial matter, the evidence makes clear that a D-42 and D-47 are discretionary actions available to the MPB if it decides that it requires more information about a prisoner before making a parole decision; it is neither a program nor accommodation provided for an inmate's use. (See also ECF No. 58-2, PageID.1060 (a D-42 or D-47 is not an "accommodation for mentally ill prisoners")). Moreover, the undisputed evidence shows that a D-42 or D-47 request is not precluded by "sham" misconduct tickets, as the MPB can and has requested such referrals for "prisoners who have received misconduct tickets," and "prisoners do not have to be misconduct free for a specific time period before a Parole Board member can vote a D-42 or D-47 referral." (*Id.*, PageID.1060).

As for a D-42 specifically, Defendants presented evidence that the MPB did not refer Carter for a D-42 because it was "not necessary" for them to obtain more information on him. To the extent Carter argues that a psychological evaluation was needed for the MPB to make an informed parole decision, it is not for Carter to dictate what "additional information" the MPB requires given its "broad discretion" in making such a decision. In any case, the evidence reflects that the MPB considered Carter's "multiple diagnosed conditions, including mental illnesses" (ECF No. 58-2, PageID.1068), "did review and consider [his] mental health information when making [the] parole decision" (id., PageID.1061), and considered interviews by Carter's treating health professionals analysis concerning his mental health and behavior (ECF No. 58-1, PageID.1002, 1008 ("Dr. Webster said P has made a significant change in direction, P wants to be in treatment . . . P has clearly made a personal effort to adjust better in prison"); ECF No. 61, PageID.1149-50 (stating MDOC mental health staff "submitted an evaluation to the

MPB of Plaintiff's positive behavior")). Even assuming that under MPB guidelines the MPB still should have ordered an additional psychological evaluation, "a failure to follow its own policy directives during the parole hearing . . . [does] not violate any liberty interest protected by the due process clause of the United States Constitution," and thus cannot be the basis for a valid claim. *Thompson v. Michigan Parole Bd.*, 2006 WL 3804892, at *2 (E.D. Mich. Dec. 22, 2006) (citing *Moran v. McGinnis*, 1996 WL 304344, *2 (6th Cir. 1996)).

As for a D-47, Defendants present evidence that the MPB deemed Carter "not suitable for parole," and therefore it was not yet necessary to develop "specialized community-based aftercare plans for parole release." (ECF No. 58-2, PageID.1055, 1059). Carter acknowledges in his response that the MPB specifically contemplated in November 2022 that he "[w]ill need D47 eventually" – i.e., when the MPB deems him "ready for parole" – but C-12 (or continuation 12 months) as [Carter] has yet to complete MSAPP which he needs to reduce risk" before he may be deemed suitable for parole. (ECF No. 58-2, PageID.1046). Moreover, Carter appears to be mistaken in his belief that the MPB can order that he be provided with mental health or community-based programs, as the MPB is "only a release authorizing unit and can set conditions of parole" but does not otherwise "have mental health programs" or "run community-based programs." (ECF No. 58-2, PageID.1069). In short, Carter cannot sustain his claims that the MPB unlawfully denied him meaningful access to a community-based aftercare program developed for those who are ready to be released on parole when the evidence makes clear that the MPB, after thorough consideration of the evidence before it, did not deem him ready for parole.

(R&R, ECF No. 63, PageID.1254.)

**3**

Carter raises two primary objections to the Magistrate Judge's recommendation and analysis with respect to the Parole Injunction Claim. Carter first complains that the Magistrate Judge "engage[d] in extensive fact-finding" during which he erroneously "accepted Defendants['] version of the facts." (Carter's Objections, ECF No. 65, PageID.1272.) In this objection, Carter identifies the facts that, according to him, were wrongly found by the Magistrate Judge. For instance, Carter complains that the Magistrate Judge should not have accepted Defendants' contention that the MPB Defendants had discretion whether to refer him for a D-42 evaluation. (*See id*.) Carter says that that contention is contrary to an official MDOC policy that requires such evaluations for inmates like him who have been hospitalized for mental illness within the last two years prior to coming before the MPB. (*See id., PageID.1272-1273.) Likewise, Carter complains that the Magistrate Judge wrongly concluded that the MPB lacked the authority to enter an order directing that he receive mental health programming upon his release. (*See id.*) Carter identifies an MDOC policy that, he says, specifically authorizes the MPB to order that such services be provided. (*See id*.)

Second, Carter complains that the Magistrate Judge failed to follow and apply what has become known as the "integration mandate," as initially established by the

Supreme Court in *Olmstead v. L.C.* 527 U.S. 581 (1999).[2]  Carter complains that the Magistrate Judge failed to recognize that his continued "unjustified isolation is properly regarded as discrimination based on disability." (Carter's Objection, ECF No. 64, PageID.1274, quoting *Olmstead*, 527 U.S. at 597.)

Carter's factual and legal objections give the Court pause with respect to determining whether the Parole Injunction Claim is viable.  The viability of that claim on the current record strikes the Court as a complicated issue – and one of great importance to Carter.  And there is reason to believe that the claim could have some possible merit.  *See* Jamelia N. Morgan, *The Paradox of Inclusion: Applying Olmstead's Integration Mandate in Prisons*, 27 Geo. J. on Poverty L. & Pol'y 305, 310-11 (2020) (observing that "[t]he integration mandate also provides a legal basis to challenge the use of solitary confinement as a behavior management tool for people with disabilities in prison.").

---

[2] As described by the Sixth Circuit, "[i]n *Olmstead*, the Supreme Court recognized that one form of discrimination prohibited thereunder is 'unjustified institutional isolation of persons with disabilities.' Accordingly, to implement § 12132, the Attorney General promulgated a regulation known as the 'integration mandate,' which provides that public entities 'shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.' 28 C.F.R. § 35.130(d)." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 459 (6th Cir. 2020) (internal citations omitted). Federal regulations apply the integration mandate in the prison setting. *See* 28 CFR § 35.152.

Given the exceptionally high stakes for Carter, and the Court's uncertainty as to whether the Parole Injunction Claim is viable on the current record, the Court concludes that the soundest course of action here is to **SUSTAIN** Carter's objection to the recommendation in the R&R to grant summary judgment on that claim and to **DENY** summary judgment on the claim.  The Court further believes that the wisest course of action is to appoint counsel for Carter and to have counsel argue the viability of the Parole Injunction Claim.  The Court will make that appointment, will hold a status conference with counsel, and will, at some later date, permit Defendants to renew their motion for summary judgment as to that claim.

## IV

For the reasons explained above, **IT IS HEREBY ORDERED** as follows:

- Defendants' objection to the R&R (ECF No. 64) is **OVERRULED**;

- Carter's objections to the R&R (ECF No. 65) are **SUSTAINED** with respect to Carter's objection to the Magistrate Judge's recommendation to grant Defendants summary judgment on the Parole Injunction Claim and **OVERRULED** in all other respects;

- The recommended disposition of the R&R (ECF No. 63) is **ADOPTED IN PART**; and

- Defendants' Motion for Summary Judgment (ECF No. 47) is **GRANTED IN PART AND DENIED IN PART**.  The Motion is

**GRANTED** with respect to the Visitation Damages Claim only.

The Motion is **DENIED** in all other respects.

**IT IS SO ORDERED**.


s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 29, 2024

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 29, 2024, by electronic means and/or ordinary mail.

s/Amanda Chubb for Holly A. Ryan
Case Manager
(313) 234-5126

26